709 A.2d 315

STATE OF NEW JERSEY IN THE INTEREST
OF K.P.   D.O.B. 3/31/81.

Superior Court of New Jersey
Chancery Division Bergen County Family Part

Decided December 29, 1997.

*Jeal Sugarman,* Asst. Bergen County Prosecutor, for the State.

*Olebukola O. Adetula,* for the juvenile K.P.

*Edward D. Rodgers,* of the firm *Ballard Spahr Andrews & Ingersoll,* for the Record Newspaper.

ROMA, J.S.C.

I

The issue this court must decide is one of first impression which, as of yet, has not been decided by either the Appellate Division or Supreme Court of New Jersey. When a juvenile court is petitioned by the press, or any interested party, pursuant to *N.J.S.A* 2A:4A–60(i), the court may permit access to the proceedings. The statute clearly indicates that the court, in its inherent discretion, "shall have the authority to limit and control the attendance in any manner and to the extent it deems appropriate." *N.J.S.A* 2A:4A–60(i). The issue, however, concerns the factors the court may consider to justify exercising its discretion. Before addressing this novel issue, the court finds it necessary to outline the procedural history, and substantive positions, taken by the parties, which have led to this decision.

In the case at bar, counsel for the Record Newspaper ("the Record") has petitioned the court pursuant to the statute set forth above, to be present in the courtroom during the trial of K.P., a

juvenile.[1]  In response to the Record's petition, K.P. has opposed
the petition to open the proceedings on the grounds that it will
have a detrimental affect upon his rehabilitation.  In addition, the
Bergen County Prosecutor's Office (the "State"), through the
Assistant Prosecutor handling the case, filed papers opposing the
presence of the news media as well.  Their position was based
upon the victim's, as well as her family's, concern about the impact
previous press coverage has had on her ability to deal with, and
hopefully recover from, the trauma this incident has caused her.

The papers submitted on the victim's behalf were accompanied
by a letter written by the victim's father, pleading with the
Assistant Prosecutor to oppose the position of the press.  The
letter states:

by co-mingling the personal horror of a sexual assault with the issue of the public's
right to information, the press successfully revealed (victim's name omitted)
identity to the local community, thereby breaching her privacy.  The poor child
went into hiding.  She is still nervous about going out in (name of town omitted).[2]

While the victim's name has not been mentioned in any article, the
practical effect is that the names of the juveniles and the victim
are known to the community.  Any news article has the effect of
further traumatizing the victim.  The day after an article is
published, when she walks into the school lunchroom, her peers
know who the article is referring to.

On September 29, 1997, the court received a letter from Mr.
Christopher Mumma, a reporter for the Record, requesting the
court's permission to attend the trial and report its progress in his
column. The court informed Mr. Mumma that such requests were
governed by statute and that his application should be formalized

---

[1] The instant trial to which the press is seeking access began with two
defendants, K.P. and F.A. These two juveniles remained within the jurisdiction of
the Juvenile Court subsequent to a waiver hearing pursuant to *N.J.S.A* 2A:4A–26.
One of the juveniles' co-defendants was waived at the above mentioned hearing
and the other co-defendant was an adult at the time of the alleged incident.  F.A.
has since plead guilty to a lesser charge and is no longer part of this trial.

[2] October 30, 1997 letter drafted by the victim's father and addressed to the
Assistant Prosecutor handling the case.

in a motion/petition, with supporting documentation, and served on all parties. The court, noting the parties were not copied in the letter, advised the parties that the informal request was received and the court's instructions that were given to the reporter.[3] On September 25, 1997, counsel for K.P. filed a letter opposing the petition and has relied solely on these papers to oppose opening the proceedings. Despite ample time prior to the November 12, 1997 hearing, and a subsequent continuance for that purpose, K.P. has failed to produce an expert witness (therapist/psychologist) to support his position. On November 7, 1997, in response to the oppositions filed by the juveniles and the State, the Record filed a reply brief. On November 12, 1997, the court held a hearing concerning this petition.

## II

Due to the complexity of the case, and the number of parties who have an interest in this decision, the court makes the following findings of fact and conclusions of law concerning the positions taken by the juveniles. The juveniles oppose additional press coverage of the trial. That much is clear from their supporting papers. What is not clear, however, is whether there is "a substantial likelihood of specific harm to the juvenile(s)" involved. *See N.J.S.A.* 2A;4A–60(i). In his papers, F.A. alleges that testimony of a highly embarrassing nature would occur during trial and that it may be detrimental to his rehabilitation.

---

[3] Should the press gain access, the testimony, as it relates to F.A., would be part of the information turned over to the press. The court has made a prior ruling that its decision to continue this trial without delay should not prejudice the press since this decision has followed a majority of the testimony in the case. Accordingly, if successful, the press would receive a copy of the transcript. F.A. has been advised of this petition as it was initiated while he remained a party to this proceeding. In response to the initial letter submitted by the reporter for the Record, prior to the filing of the formal petition, F.A. responded via letter brief opposing the request. Upon receipt of the press' motion, F.A. filed a second brief confirming his opposition to press coverage. Since entering his plea, F.A. has waived his ability to have a therapist/psychologist testify on his behalf and has relied upon his papers to advocate his position.

The Record was quick to point to *State. in the Interest of Phillip Presha*, 291 *N.J.Super.* 454, 677 *A.*2d 806 (Ch.Div.1995) in which the court squarely rejected this contention, stressing that "the general adverse affects of publicity from access are presumed and cannot be utilized as grounds to deny access." *Id.* at 459, 677 *A.*2d 806. The Appellate Division confirmed the correctness of this interpretation in *State in the Interest of K.B.*, 304 *N.J.Super.* 628, 701 *A.*2d 760 (App.Div. 1997).

The Appellate Division, although interpreting a different section of *N.J.S.A.* 2A:4A–60, namely subsection (f), did stress that the harm required by the language in the statute should be situation-particular and not shared by juvenile defendants in general. The court finds that the only variation between subsection (f) and (i) is that subsection (f), in addition to requiring a substantial likelihood of specific harm, states that such harm should also be extraordinary. The court finds that the magnitude of the harm necessary varies with regard to the two subsections, however, the Appellate Division's finding that the harm must be situation particular is consistent in both subsections.

In addition to the possibility of embarrassment, F.A. alleged that there was a possibility that psychological information regarding F.A. would come out during trial and the publication of same could endanger efforts to rehabilitate him. In light of F.A.'s guilty plea prior to the presentation of his case, this argument is moot. Based upon the foregoing, the court finds that F.A. has failed to show that there is a substantial likelihood that specific harm to him will result if the court allows the press access to the proceedings.

■ As to the position taken by K.P., the Record did not address his position in their reply papers dated November 7, 1997. The court, however, has reviewed K.P.'s letter dated September 25, 1997. Although the court finds the letter to be sincere, counsel can only point to general harassment which is alleged to have occurred while this trial is pending. The court is concerned when it hears that a juvenile is being harassed by the public; however,

as stated earlier, this amounts to a common adverse affect usually associated with any juvenile who has found him or herself in a similar situation as K.P. Additionally, K.P. points to his necessity to resort to professional psychological counseling as a result of the past publicity associated with this case. As stated earlier, K.P. has failed, despite ample time to do so, to have this expert testify on his behalf. Accordingly, the court finds that K.P. has failed to show there is a substantial likelihood that specific harm to him will result if the court allows the press access to the proceedings. Having ruled on the juvenile's positions regarding this issue, the only remaining issue is the victim's position advocated by the State.

### III

■   Essentially, the issue is whether the victim, as well as the juvenile defendants, have standing to oppose a petition by the Record to open this juvenile proceeding by showing a substantial likelihood that a specific harm to her will result if the Record were allowed access? The Record responded to the State's argument claiming that the impact upon the victim is not a relevant factor the court should consider when deciding such a motion pursuant to *N.J.S.A.* 2A:4A–60(i). Accordingly, the Record claims the victim lacks standing to voice an objection and consequently the court should not consider the State's request.

One of the seminal cases dealing with the issue of standing is *Flast v. Cohen*, 392 *U.S.* 83, 88 *S.Ct.* 1942, 20 *L.Ed.*2d 947 (1968). In *Flast*, Chief Justice Warren, delivering the opinion for the Supreme Court of the United States, held that federal taxpayers had standing to sue to prevent such expenditures that were prohibited by the Establishment Clause of the First Amendment. The Supreme Court held that the taxpayers had a "personal stake" in the litigation. *Flast*, 392 *U.S.* at 99, 88 S.Ct. at 1952.

"The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a ... court and not on the issue he wishes to adjudicate." *Id.* "The gist of the question of

standing is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' " *Id. quoting Baker v. Carr,* 369 *U.S.* 186, 204, 82 *S.Ct.* 691, 703, 7 *L.Ed.*2d 663 (1962). "[T]he emphasis in standing problems is on whether the party invoking ... court jurisdiction has 'a personal stake in the outcome of the controversy,' " *Id. quoting Baker v. Carr,* 369 *U.S.* at 204, 82 *S.Ct.* at 703. "and whether the dispute touches upon 'the legal relations of parties having adverse legal interests.' " *Id.* at 101, 88 *S.Ct.* at 1953 *quoting Aetna Life Insurance Co. v. Haworth,* 300 *U.S.* 227, 240–241, 57 *S.Ct.* 461, 463–464, 81 *L.Ed.* 617 (1937). In other words, when standing is placed in issue in a case, the question is whether the person whose standing is challenged, is a proper party to request an adjudication of a particular issue, and not whether the issue itself is justiciable. *Flast,* 392 *U.S.* at 99, 88 *S.Ct.* at 1952.

Later in 1970, the United States Supreme Court, in an opinion delivered by Justice Douglas, brought the standing issue a step further. In *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 *U.S.* 150, 90 *S.Ct.* 827, 25 *L.Ed.*2d 184 (1970), the Supreme Court established a second, non-constitutional standing requirement that the interest of the party at least be "arguably within the zone of interest to be protected or regulated" by the statutory framework within which his or her claim arises. *Association of Data Processing Service Organizations,* 397 *U.S.* at 153, 90 *S.Ct.* at 829–830.

In the case at bar, there is no question the victim has a direct interest in the issue before the court. Should the court decide to open the proceedings, the victim will be directly affected. Accordingly, the court finds the victim has a "personal stake in the outcome." *See Baker,* 369 *U.S.* at 204, 82 *S.Ct.* at 703. The State says the victim has standing to petition the Court to close the proceeding and the Record says she does not. Therefore, as

required, the Court finds the issue is presented in a form historically viewed as capable of judicial resolution in an adversarial context and represents a true case and controversy. *See Flast,* 392 *U.S.* at 102, 88 *S.Ct.* at 1953–1954. Moreover, applying the holding in. *Association of Data Processing Service Organizations supra,* to the present case, the court finds that the victim is clearly within the "zone of interest" which the Legislature intended. The Legislature, within the statute in question, *N.J.S.A.* 2A:4A–60(i), specifically gives a victim the ability to open a proceeding and the right to be heard prior to a disposition in a juvenile case.

## IV

As previously stated, a hearing was held on November 12, 1997 concerning this petition and argument was heard by all parties.[4] During the hearing, the court first addressed the argument proffered by counsel for K.P. The court's ruling regarding K.P. has been set forth above. The next issue the court addressed was the issue concerning the victim's standing. Despite the Record's request that the court rule on the issue concerning standing at that time, the court reserved, and the rest of the hearing was devoted to the testimony of Dr. Judith M. Kernodle, the victim's treating psychiatrist. Dr. Kernodle testified as to the effects further publicity will have on the victim. The testimony of Dr. Kernodle is addressed later in the opinion. First the court must address this novel issue concerning the victim's standing.

Preliminarily, there has been discussion as to whether there is a presumption of openness as to juvenile proceedings to be rebutted by the juvenile and perhaps other interested parties such as the victim in the instant case. The court finds that it need not decide whether such a presumption of openness is in fact created by the statute. The Record relies on *Presha* which stated that the statute "effectively creates a presumption of public access." *Id.* at

---

[4] F.A. chose not to attend the November 12, 1997 hearing and consequently has offered no oral argument in support of his objection to the press petition.

457, 677 *A*.2d 806. While the court may consider this case for guidance, its decision has no precedential effect on this court.

The court is inclined to agree with the holding in *Presha*, in light of the modern trend of opening juvenile proceedings when appropriate. In the case at bar, however, the court need not make such a determination. As pointed out further on in this opinion, the harm that is likely to occur to the victim far outweighs any presumption of openness. In fact, the Record has declined to address this secondary issue to date and has recently requested the court to render its decision based upon the record as it stands. It is the opinion of this court that should standing be granted, the Record will concede that the likely effects of harm to the victim are substantial and specific to her.

In support of the victim's position, the State points to the specific language of *N.J.S.A.* 2A:4A–60(i), wherein the court is given inherent discretion to keep the proceedings closed. The State contends that the discretion is broad, and in the interest of fairness and justice, the court can consider detrimental effects on a victim as a factor in making its ruling. The Record, however, disputes this theory and claims that the discretion attaches to the specific harm to the juvenile, which is the express language of the statute. The Record suggests that a strict adherence to the plain language of the statute is what our Legislature intended.[5]

Alternatively, the court finds the State's argument persuasive. The area of victims' rights has been the subject of considerable attention in recent years. "[T]he people of New Jersey, speaking

---

[5] The Court reviewed the legislative history of *N.J.S.A.* 2A–4A–60. It was passed under Bill No. A643 of the Laws of 1982 Chapter 79. It was sponsored by Assemblyman Walter M.D. Kern from Bergen County. It passed in the Assembly on February 1, 1982 unanimously (74–0) and in the Senate on May 24, 1982 also unanimously (37–0). It was received back in the Assembly that same day. The law was approved by Governor Kean on July 23, 1982. The legislative history included a sponsor statement, Senate Committee statement, and a Governor's Message on signing. The above referenced material was devoid of any information helpful in determining the specific, intent behind the wording of *N.J.S.A.* 2A:4A–60(i).

through the Legislature, have repeatedly expressed a very strong 'public policy' that victims be provided more rights." *State v. Muhammad,* 145 *N.J.* 23, 34, 43, 678 *A.*2d 164 (1996) On the Federal level, the movement started, in large part, due to The President's Task Force on victims of Crime, which was created by President Reagan on April 23, 1982. Subsequent legislation followed over the next several years: the *Victims of Crime Act of 1984,* 42 *U.S.C.A.* par. 10606 to 10607 (establishing Crime Victims' Fund to provide funding for state victim compensation programs); the *Victims' Rights' and Restitution Act of 1990,* 42 *U.S.C.A.* par. 10606 to 10607 (providing victims' rights to be treated fairly, to be protected from accused offender, to be notified and present at all court proceedings related to the offense, and to be informed about conviction, sentencing, imprisonment and release of the offender); and the *Civil Rights Remedies for Gender–Motivated Violence Act,,* 42 *U.S.C.A.* par. 13981, included in the *Violence against Women Act of 1994,* 108 Stat.1902 (1994) (providing civil rights cause of action to victims of gender-motivated violence).

On the State level, the New Jersey Legislature also enacted statutes providing for the protection of victims: the *Crime Victim's Bill of Rights, N.J.S.A.* 52:4B–34 to 38 (eff. July 31, 1985) (granting rights to victims, including right to be treated with dignity and compassion, to be informed about criminal justice process, and to be told about available remedies and social services; later amended to allow victim impact statements at sentencing); the *Victim/Counselor Privilege Act, N.J.S.A.* 2A:84A–22.13 to 22.15 (1987) (enacting *N.J.R.E.* 517) (extending testimonial privilege to contents of communications between victim and counselor); in and the *Victim Impact Statute, N.J.S.A.* 2C:11–3c(6) (1995) (allowing victim impact statements in capital cases). Additionally, and directly on point, in 1994 the Legislature amended *N.J.S.A.* 2A:4A–60(c)(1) and (i) to require victim notification, and to require the court to permit a victim, or a member of the victim's family, the opportunity to make a statement prior to a disposition of any juvenile adjudicated delinquent of an offense, that if committed by an adult, would constitute a crime.

It is difficult for the court to imagine that the Legislature intended to give victims these expansive rights, yet specifically intended that they should not be a factor for a court to consider when there is compelling evidence that a detrimental effect upon a victim will occur if the court ignored their request. The State contends that the Legislature specifically identified victims to be considered an interested party with standing to open a proceeding, and, therefore, the court should determine that the ability to open suggests standing to close. The court agrees. The court finds that the legislative intent is more in line with considering the victim's position as opposed to ignoring it. The court finds a victim is a constructive equivalent to a party in the case.

The court disagrees with the Record's contention that the absence of the wording "juvenile or victim" is a clear indication of the Legislature's intention to ignore potential consequences on the victim. As stated earlier, in 1994, the Legislature amended *N.J.S.A.* 2A:4A–60(i) to give the victim the right to make a statement during the dispositional phase of a juvenile matter. It is inconsistent to find a direct intention to grant victims the right to be heard prior to imposing a disposition and simultaneously finding it was the Legislature's intent to specifically exclude the victim when deciding whether or not to close a juvenile proceeding. Any proceeding incidental to a sentencing would include a victim's right to have standing. The court finds that the Legislature included the discretionary authority for the courts to be used to prevent a miscarriage of justice.

## V

In 1982, one of the proposals of President Reagan's Task Force was an amendment to the federal constitution to protect victims' rights. The Task Force found that a constitutional amendment was required: "the combined experience brought to this inquiry and everything learned during its progress affirm that an essential change must be undertaken; the fundamental rights of innocent citizens cannot adequately be preserved by any less decisive

action." [6]    In light of the overwhelming task of obtaining a federal constitutional amendment, focus was turned toward each individual state.

On November 5, 1991, the New Jersey electorate overwhelmingly approved Article I, paragraph 22 of the New Jersey Constitution, better known as The Victims' Rights Amendment.[7]    It was the first of only two amendments to the Bill of Rights of the 1947 New Jersey Constitution.[8]    The amendment provides:

"A victim a crime shall be treated with fairness, compassion and respect by the criminal justice system. A victim of a crime shall not be denied the right to be present at public judicial proceedings except when the victim is properly sequestered in accordance with law or the Rules Governing the Courts of the State of New Jersey. A victim of a crime shall be entitled to those rights and remedies as may be provided by the Legislature ..."

The State contends that the amendment requires the court to consider the victim's position when the court is ruling on an issue that affect a victim as well as the juvenile defendant.  The court agrees.  Perhaps the underlying issue this court must decide is whether the amendment is self-executing.  If so, a victims right to be treated fairly, compassionately and respectfully is operative without supplemental legislation, and the issue regarding standing flows directly from such a determination.

The first substantive provision of the Victims' Rights Amendment provides that victims of crime "shall be treated with fairness, compassion and respect by the criminal justice system." *N.J. Const.* art. I, par. 22.  This provision effects a fundamental change

---

[6] PRESIDENT'S TASK FORCE ON VICTIMS OF CRIME, FINAL REPORT 2, 114–15 (1982).

[7] The Amendment passed with 84.5% of the vote.  132 *N.J.L.J.* 781, 808 (1992), *Where are all the Victims?*, Richard Pliskin.

[8] On November 3, 1992, voters adopted the second amendment, amending art. I, par. 12 which effectively overruled the holding in *State v. Gerald*, 113 *N.J.* 40, 549 *A.*2d 792 (1988) which dealt with the scope of New Jersey's "cruel and unusual punishment clause" of the State Constitution.  As to the Victim's Rights Amendment, over 1,200,000 citizens voted for it while only 223,248 people voted against it.  *State v. Muhammad*, 145 N.J. 23, 43, 678 A.2d 164 (1996)

in the criminal justice system. Instead of adopting a two-party *State v. Defendant,* paradigm, this provision requires that the system consider interests of third parties, specifically crime victims. Unfair practices that deny crime victims fairness, compassion and respect are unconstitutional under the amendment.[9] "Ensuring the right of victims to appropriate treatment is perhaps the most fundamental of all rights for victims. In the absence of further legislative elaboration, the words of the provision carry their ordinary dictionary definitions." [10] The definitions are as follows:

**Fairness**—(Fair)—def. 6(a) marked by impartiality and honesty: free from self interest, prejudice and favoritism: (b)(1) conforming with established rules: Allowed (2): consonant with merit or importance: Due (c) open to legitimate attack or ridicule: free from favor toward either or any side.[11]

**Compassion**—Sympathetic consciousness of others distress together with a desire to alleviate it (compassionate—def. 2: granted because of unusual distressing circumstances affecting an individual).[12]

**Respect**—1(a): To consider worthy of high regard: Esteem: 2:an act of giving particular attention: Consideration: 3(a): high or special regard: Esteem.[13]

Based upon these standard definitions, the court finds the amendment mandates victims be treated accordingly.

This interpretation is historically consistent with Supreme Court jurisprudence, and how it has developed our most fundamental rights, including the very right to freedom of the press, upon which the Record relies. The United States Supreme Court has molded our great country by building upon our most fundamental rights, creating unarticulated rights that go hand in hand with what it believes our forefathers intended when they drafted the

---

[9] 4 Utah Law Review 1373, 1387 *Balancing the Scales of Justice: The Case for and the Effects of Utah's Victims' Rights Amendment,* Paul G. Cassel.

[10] Id.

[11] Webster's Ninth Collegiate Dictionary (1991).

[12] *Id.*

[13] *Id.*

Bill of Rights, and the subsequent amendments that were enacted. In fact, the United States Supreme Court found the right of the press to be present at criminal proceedings in this fashion, by extending the First Amendment right to freedom of the press.

In *Richmond Newspapers, Inc. v. Virginia*, 448 *U.S.* 555, 100 *S.Ct.* 2814, 65 *L.Ed.*2d 973 (1980), the United States Supreme Court held that the press had an unarticulated right of access, which it found within the penumbra of the First Amendment and applied to the States through the Fourteenth Amendment. It should be noted that the United States Supreme Court and the Supreme Court of New Jersey have yet to decide whether this right extends to juvenile proceedings..

As with cases like *Richmond Newspapers*, which call for constitutional interpretation, the court finds, within the Victims' Rights Amendment, a fundamental right to be treated with fairness, compassion and dignity, and through the penumbra of Article I, paragraph. 22, the Court finds a victim has standing, and an unarticulated right to oppose a petition by the press to open a juvenile proceeding.

In *Globe Newspaper Co. v. Superior Court*, 457 *U.S.* 596, 102 *S.Ct.* 2613, 73 *L.Ed.*2d 248 (1982), the United States Supreme Court was faced with a Massachusetts statute that excluded the public from the courtroom when a minor was the victim of a sex crime. The Supreme Court, in finding the statute unconstitutional, held that the state interest secured by the statute was compelling; however, it ruled that it was not narrowly tailored to address the specific need of the child. *Id.* at 606–607, 102 *S.Ct.* at 2619–2620. In reversing the conviction, the United States Supreme Court stated that the balancing of a compelling state interest with a fundamental right of the accused must be determined by the trial judge on a case-by-case basis. *Id.* at 607–608, 102 *S.Ct.* at 2620–2621.

The holding in *Globe Newspaper Co.* is on all fours with the reasoning behind the court's findings in the present case. In

*Globe Newspaper Co.*, the United States Supreme Court was faced with an adult defendant and the constitutional right of access of the press to the courtroom. In *Globe Newspaper Co.*, while finding the Massachusetts statute unconstitutional, the court was careful to point out that had the statute been drafted to apply on a case by case basis, the statute would have held up to constitutional scrutiny, despite the constitutional right of access to the courtroom. In the present case, the court is faced with a juvenile proceeding. Accordingly, the press does not have a constitutional right of access to the courtroom.

Furthermore, the decision by this court withstands the scrutiny set forth by the Supreme Court in *Globe Newspaper Co.* and does not affect the constitutionality of *N.J.S.A.* 2A:4A–60(i). The statute remains narrowly tailored, in that, the standard of review to close a proceeding remains subjective and will be determined based upon the facts of each case. The decision of this court does not create a *per se* ban on press access.

This finding, does however, give meaning to the constitutional rights of victims. "The judiciary ... has an obligation to give effect to the voice of the sovereign voters expressed in the constitutional amendment process. Implicit in a determination that the amendment is self executing is the recognition that victims have standing to pursue their new constitutional rights." [14] The amendment itself identifies those with standing by defining who in fact is considered a victim by the amendment:

" '[V]ictim of a crime' means: a) a person who has suffered physical or psychological injury or has incurred loss of or damage to personal or real property as a result of a crime or incident involving another person operating a motor vehicle under the influence of drugs or alcohol, and b) the spouse, parent, legal guardian, grandparent, child or sibling of the decedent in the case of a criminal homicide."

*N.J. Const.*, art. I, par. 22 (November 5, 1991).

██ Furthermore, the court finds that the second sentence of the amendment clearly gives victims an inalienable right to be

---

[14] 25 RUTGERS LAW JOURNAL 183, 192–193 (1993); *New Jersey Constitutional Amendment for Victims' Rights: Symbolic Victory?*, Richard E. Wegryn.

present during a criminal proceeding, subject only to rules concerning sequestration. This sentence clearly gives a victim a substantive right to be present during a criminal proceeding. A finding by this court that each part is not severable from the next would render the first two sentences of the amendment meaningless. Based upon the wording of the second sentence, it is clear that each part of the amendment was intended to be read separately.

The Record states that "[b]y its terms, the amendment accords a crime victim only 'those rights and remedies as may be provided by the Legislature.' Thus it confers no additional substantive rights on victims." The Record cites *State v. Muhammad, supra,* to support this position. The court, however, finds that *Muhammad* is distinguishable on both its facts and the law. In *Muhammad,* the Supreme Court of New Jersey was faced with the constitutionality of the victim impact statute, *N.J.S.A.* 2C:11–3(c)(6) (June 19, 1996), which was enacted pursuant to *N.J. Const.* art. 1, par. 22. The statute was reviewed based upon the Legislature's authority to expand upon the basic rights afforded victims by the amendment. In the instant case, the issue surrounds those very basic rights set forth in the first sentence of the amendment. Our concern is whether standing should be read in *pari materia* with the fundamental right to be treated with fairness, compassion, and respect by the criminal justice system.

Moreover, the Court finds that the holding in *Muhammad* is consistent with the court's ruling on this issue.

"Unlike most interpretations of constitutional provisions, we need not surmise what the founders intended when they drafted the Victims' Rights Amendment. We know exactly what the founders of this constitutional amendment intended—fair treatment for victims."

[*Muhammad, supra,* 145 *N.J.* at 42–43, 678 *A.*2d 164.]

" '[J]ustice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true.' "

[*Muhammad, supra,* 145 *N.J.* at 45–46, 678 *A.*2d 164 *quoting Snyder v. Massachusetts,* 291 *U.S.* 97, 122, 54 *S.Ct.* 330, 338, 78 *L.Ed.* 674 (1934).]

The Supreme Court went on to hold the victim impact statute constitutional under Article I, paragraph 22. Additionally, the Court was careful to point out that the minor limitations placed upon an impact statement's admission were not designed to restrict any of the rights afforded to victims by the amendment. *Id.* at 55, 678 *A.*2d 164. In upholding the statute, the Supreme Court was mindful of the words of Justice Pashman in *New Jersey Sports & Exposition Auth. v. McCrane,* 119 *N.J.Super.* 457, 476–477, 292 *A.*2d 580 (Law Div.1971), *aff'd as modified,* 61 *N.J.* 1, 292 *A.*2d 545, *appeal dismissed* 409 *U.S.* 943, 93 *S.Ct.* 270, 34 *L.Ed.*2d 215 (1972).

> "It must be remembered that the greatest danger to the people from the exercise of the judicial power is that there may be a usurpation by the courts of the people's right to express in law, by the overwhelming numbers of their elected legislators, and their collective reasoning."
>
> [*Muhammad, supra,* 145 *N.J.* at 42, 678 *A.*2d 164.]

Applying this advice to the Victims' Rights Amendment, the court finds that a holding which denies the victim standing in this case would result in a manifest injustice. A constitutional amendment, whether it be federal or state, is perhaps the finest example of a truly democratic society and should be treated accordingly by the judiciary.

The Record contends that its interpretation does not render the amendment a nullity. The court, however, finds that their interpretation is incomplete. It is true that the New Jersey Constitution explicitly provides victims of crimes with more rights than the Federal Constitution. It is true, however, for several reasons. First, the amendment gives victims the right to be treated with fairness, compassion and respect. These rights are fundamental and were meant to serve as a floor and not a ceiling. Second, the amendment gives victims the right to be present during the criminal proceedings. This too is a fundamental right. Third, it authorized the Legislature to expand upon these fundamental rights as it deems necessary. Despite the Record's contention, the authority granted to the Legislature to expand upon the

amendment as it deems necessary was not the sole intent of the framers.

To agree with the Record's limited view would effectively say— the people of New Jersey amended their constitution to grant the Legislature power *it already* possessed (emphasis added). We must not forget that the victims' rights movement did not commence with the approval of the constitutional amendment; rather it has culminated with its ratification. As early as 1971, the Legislature began enacting laws that granted rights to victims of crime. *N.J.S.A.* 52:4B–25 effectively amended and supplemented the *Criminal Injuries Compensation Act of 1971* which was approved October 4, 1971 (P.L.1971, c. 317). Since that time, the courts have rarely questioned the constitutionality of victim sensitive legislation.

The general public, specifically victims, perceive the judge as the person ultimately administering the criminal justice system.[15] Historically, the legal system did not view crime victims as having any rights.[16] "The victims' rights movement has resulted in the adoption of new procedural and substantive rights for victims. Judges must learn and implement those new constitutional provisions and statutes because they will bring about a better justice system." [17]

In this country, criminals are presumed innocent until proven guilty beyond a reasonable doubt. With such protections afforded the accused, how could we ever question the constitutionality of legislation that is narrowly drafted, does not infringe upon the rights of the accused and is enacted with the sole purpose of

---

[15] 34 Judges Journal 29 (Winter 1995) John Albrecht, *The Rights and Needs Of Victims of Crime: The Judges' Perspective.*

[16] 8 St. John's J. Legal Comment 157 (1992) Andrew J. Karmen, *Who's Against Victims' Rights? The Nature of the Opposition to Pro–Victim Initiatives in Criminal Justice.*

[17] 34 JUDGES JOURNAL 29, 34 (Winter 1995) John Albrecht, *The Rights and Needs Of Victims of Crime: The Judges' Perspective.*

providing an innocent group of people with the right to be treated with compassion and respect. "[A] judge must be prepared to implement a victim's rights just as accurately as he or she would protect a defendant's." [18]

Based upon the findings set forth above, the court finds that the amendment provides victims with specific rights, and that these rights carry with them standing for a victim to voice their concerns and protect their constitutional rights. The court finds a victim is entitled to equality of remedy as required by the constitutional amendment. The court finds that denying the victim in this case the ability to close the proceedings, when she can clearly demonstrate a substantial likelihood that specific harm to her recovery will result, would infringe upon her right to be treated with fairness, compassion and respect by the criminal justice system.

## VI

Assuming, *arguendo*, the Record's interpretation of the constitutional amendment applies, the court cannot ignore the legislative direction set forth by the *Crime Victim's Bill of Rights, N.J.S.A.* 52:4B–34 to 38 (eff. July 31, 1985). One can not dispute the intent of the Legislature in this regard.

The Record argues that the constitutional amendment does not extend any substantive rights to victims. Although the court disagrees, the decision to grant the victim standing and the subsequent closing of the proceedings based upon the harm additional press coverage will cause her, is justified pursuant to *N.J.S.A.* 52:4B–36(a). The statute, as does the amendment, mandates the criminal justice system to treat a victim with dignity and compassion. The amendment, essentially, augmented victims' statutory rights by raising them to constitutional significance.

---

[18] *Id.* at 29.

The argument proffered by the court, earlier in the opinion, also applies to this analysis. To ignore the victim's request, despite the unquestionable harm that will result, is inconsistent with fair, compassionate and respectful treatment. Furthermore, if a victim feels a ruling by the court infringes upon these rights, pursuant to *N.J.S.A.* 52:4B–36(a), the victim would have standing to object and advocate for a ruling respecting its rights.

An important factor that can not be overlooked in this case is the position taken by the juveniles regarding press access. In *Muhammad,* the Supreme Court was faced with legislation that was enacted pursuant to Article I, paragraph 22. The victim impact statute was challenged on constitutional grounds, alleging that it violated other constitutional rights held by defendants. In the case at bar, both juveniles oppose additional press coverage. Whether or not they have met their burden of showing specific harm is not the issue. Granting victims standing, as it relates to *N.J.S.A* 24:4A–60(i), is consistent with the rights of a juvenile defendant.

Additionally, as previously mentioned, the press' right to be present during a criminal trial, as set forth in *Richmond Newspapers* and its progeny, has yet to be extended to juvenile delinquency hearings by both the United States Supreme Court and the Supreme Court of New Jersey. Juvenile proceedings are still viewed as closed family court matters which are more rehabilitative than adversarial. The court is aware that we are moving toward a less confidential juvenile court as evidenced by the language of the relevant statute; however, this "openness" is not absolute. The juvenile justice system is obligated to protect the best interests of juveniles. That obligation extends to both a juvenile defendant and a juvenile victim.

In conclusion, an important motivation for reaching this decision, is our responsibility, as judges, to protect minors and their families from any emotional or physical harm. This protection is never more important than situations involving a child victim. In these delicate situations, the court exercises its *parens patriae*

authority and must protect this child from pending harm. The court finds that all victims deserve similar treatment. Perhaps the best summation of the reasons for a decision such as this, came from the Final Report of the President's Task Force on Victims of Crime published in 1982. It is for these reasons we must respect victims of crime and protect them from a second victimization by the judicial process:

"Victims who do survive their attack, and are brave enough to come forward, turn to their government expecting it to ... protect the innocent. Without the cooperation of victims and witnesses in reporting and testifying about crime, it is impossible in a free society to hold criminals accountable. When victims come forward to perform this vital service, however, they find little protection. They discover instead that they will be treated as appendages of a system appalling out of balance. They learn that somewhere along the way the system has lost track of the simple truth that it is supposed to be fair and to protect those who obey the law while punishing those who break it. Somewhere along the way, the system began to serve lawyers and defendants, treating victims with institutionalized disinterest." [19]

For the reasons set forth above, and in the interest of justice, the court finds the victim has standing pursuant to both Article I, paragraph 22 of the *New Jersey Constitution* and *N.J.S.A.* 52:4B–36(a), the *Victims' Bill of Rights*, and accordingly, can petition the court to consider her position on whether to grant the Record access pursuant to *N.J.S.A.* 2A:4A–60(i). The court recognizes its inherent authority given by the Legislature when it enacted *N.J.S.A.* 2A:4A–60(i), and finds it necessary to exercise same to protect the victim in this case.

## VII

█ Having ruled the victim possesses standing to oppose the within application, the court must decide whether the victim can show a "substantial likelihood of specific harm" will occur if the press were allowed to be present to cover the trial. *See N.J.S.A.* 24:4A–60(i). In support of its position, at the November 7, 1997

---

[19] 4 Utah Law Review 1373, 1379 Paul G. Cassel, *Balancing the Scales of Justice: The Case for and the Effects of Utah's Victims' Rights Amendment, quoting* President's Task Force on Victims of Crime, Final Report 2 (1982).

hearing, the State called Judith M. Kernodle, M.D., the victim's treating psychiatrist, to document the effects additional press coverage will have on the victim's recovery. It should be noted that the parties stipulated that Dr. Kernodle was an expert in the field of psychiatry. A copy of Dr. Kernodle's *curriculum vitae*, was introduced as S–1 and moved into evidence by the State.

Dr. Kernodle testified that she began treating the victim immediately following the incident. In Dr. Kernodle's expert opinion, the victim suffers from Post Traumatic Stress Disorder (commonly referred to as "PTSD"). The cause of PTSD is a traumatic event.[20] Events that trigger such a disorder include natural disasters, terrorism, military combat and personal violence.[21]

Perhaps the most notable cause of PTSD was the Vietnam War. All wars subject military personnel to miserable living conditions, severe fatigue, sensory stresses such as hearing loss from planes and artillery, the continual threat of and exposure to death, the suffering occasioned by wounds and the experience of witnessing others being killed and wounded.[22] However, several additional stressors were specific to the war in Vietnam. These included the lack of clear military objectives and the limits placed on offensive actions, the war's guerrilla tactics, difficulty in determining who the enemy was, all of which resulted in civilian casualties.[23] Additionally, the atrocities that have been documented had a powerful effect on those who participated in them, witnessed them or heard of them.[24] Likewise, the unwelcome feeling experienced by many of the soldiers returning home is unique to the Vietnam

---

[20] 12 Attorney's Textbook of Medicine, sec. 101A.01, Third edition, Roscoe N. Gray, M.D. and Louise J. Gordy, M.D. LL.B. (1997)

[21] *Id.* at 101A.11(1)–(4).

[22] *Id.* at 101A.11(1).

[23] *Id.*

[24] *Id.*

War. As a result, Vietnam veterans have a high rate of chronic PTSD.[25]

The characteristic symptoms of PTSD include re-experiencing the event, a general numbing of responsiveness to the external world and symptoms of increased arousal.[26] It is believed that certain risk factors such as age, pre-existing personality traits, and the severity of the traumatic event affect the development and course of the disorder.[27] PTSD may occur at any age, but an individual's age at the time of the trauma can color the symtomology and influence the course of the disorder.[28] The young are more vulnerable because their coping mechanisms are undeveloped.[29] For example, the effect of the Vietnam War was enhanced by the youth of the soldiers, whose average age was nineteen, as opposed to twenty-four, the situation in World War II.[30]

Similarly, the specific effects of a severe trauma on a child are determined, in part, by the developmental phase and level of maturity the child has attained.[31] In the present case, Dr. Kernodle testified that the victim, who was fourteen at the time the incident occurred, and is presently fifteen years of age, is in her formative years and has characterized her as immature.

As previously mentioned, the trauma following personal violence often results in PTSD. Sexual assault, which is what the victim faced in the instant case, it one of the more severe forms of personal violence a person can face. Many studies have shown

---

[25] *Id.*

[26] *Id.* at 101A.01.

[27] *Id.* at 101A–13.

[28] *Id.* at 101A–13(1).

[29] *Id.*

[30] *Id.*

[31] *Id.*

that the intensity of the traumatic event as a significant influence on the psychological outcome.[32] In the present case, the victim was allegedly assaulted by several boys at the same time. She was also under the influence of alcohol and marijuana at the time the incident occurred. As far as intensity of the trauma is concerned, the court finds the number of juveniles alleged to have committed these acts, as well as the vulnerability of the victim under the circumstances, raises this assault to the highest level imaginable. Coupled with the age of the victim and her level of maturity, it is easy, even for a lay person, to see that the risk factors associated with PTSD are enhanced in this case.

Dr. Kernodle testified that every time an article appeared in the newspaper regarding this case, the victim would suffer a setback in her progress. This past summer, according to Dr. Kernodle, the victim was doing well and making significant progress. When the case came to trial in the fall, there were preliminary articles, general in nature, associated with the pending case. One of these articles covered F.A.'s guilty plea given during the trial, with a review of the significant facts of the case.

Dr. Kernodle testified that these articles, regardless of which page they appeared on or the size and detail to which the article entailed, had a detrimental effect upon the victim. Dr. Kernodle testified that the articles and publicity contributed to a belief by the victim that this was her identity. Whether it was at school, socially, or within her family structure, she could only equate her identity with the girl who was sexually assaulted. These articles that resurfaced this fall had the same effect. According to Dr. Kernodle, the victim suffered from anticipatory anxiety and was afraid she would lose control.

Presently, Dr. Kernodle diagnosed the victim's PTSD as acute. The progress she has achieved to date is encouraging, despite the setbacks that she has suffered. Dr. Kernodle emphasized that the victim is in her formative years and how she is able to cope with

---

[32] *Id.* at 101A.13(2).

the trauma she has endured is critical to her hope for recovery. Life for the victim began to get back to normal at home, in school, and in society in general. Dr. Kemodle testified that the longer the victim can be protected from setbacks, such as the episodes caused by newspaper articles, the better her chances are, in her opinion, for the victim to recover from PTSD.

It should be noted that Dr. Kernodle was very specific in pointing out that the absence of the victim's name in any of the articles is of no consequence. The entire community is aware of who she is, and when an article appears in the newspaper, there is no question everyone in the community knows the identity of the victim and the juveniles. It is easy to claim that the absence of her name preserves her anonymity and her privacy; however, the court finds that, in reality, every time an article appears, everyone knows the names of the individuals referenced in the newspaper account of the court proceedings.

In addition to the setbacks in her recovery caused by press coverage, Dr. Kernodle testified that, in her expert opinion, further press coverage, especially the coverage associated with day to day reporting of the events that have occurred at trial, will lead to *chronic* PTSD. There is no doubt in Dr. Kernodle's mind that continued press coverage will lead to permanent harm to the victim.

In Dr. Kernodle's opinion, the anxiety and depression she is suffering from combined with the alienation from other people, which has followed when articles have appeared in the newspaper, can lead to social isolation. The victim, as well, may socially withdraw, afraid of her own behavior.[33] Additionally, in light of her age, she may experience changes in her ability to recognize and tolerate fear.[34] She may try to reverse her feelings of anxiety and helplessness through fantasies that attempt to undo the

---

[33] *Id.* at 101A.21(4).

[34] *Id.* at 101A.30.

history of the trauma and its consequences or to limit risks that such a thing could happen again in the future.[35]  She may even develop a pessimism about the future, expecting her life span to be shortened.[36]

In the opinion of Dr. Kernodle, there is more than a "substantial likelihood" harm will result.  Dr. Kemodle believes chronic PTSD will result if the victim is subjected to further set backs in her recovery.  The court accepts Dr. Kernodle testimony.  In light of the testimony given by Dr. Kemodle, the court finds that allowing the Record access to the proceedings will clearly result in a specific harm to the victim.  It should be noted that the Record's responsive papers, dated November 20, 1997, only addressed the issue of standing, and despite the opportunity to do so, it did not touch upon the likelihood, or the extent of, potential harm to the victim.

For the reasons set forth above, and in the interest of justice, the Record's petition for access to these proceedings is denied.