**Cynthia COOPER, Petitioner,**

v.

**DISTRICT COURT and Daniel R. Cooper Jr., Respondents.**

No. A–8835.

Court of Appeals of Alaska.

April 14, 2006.

---

5. *See Risher v. State,* 523 P.2d 421, 425 (Alaska 1974).

Katherine J. Hansen, Alaska Office of Victims' Rights, Anchorage, for the Petitioner. Allison E. Mendel, Anchorage, for Respondent Daniel R. Cooper. No appearance for Respondent District Court.

Allen M. Bailey, Anchorage, for (1) the National Crime Victim Law Institute and (2) the Victim Advocacy and Research Group; Christine McLeod Pate, Sitka, for the Alaska Network on Domestic Violence and Sexual Assault.

John E. McConnaughy III, Deputy Municipal Attorney, and Frederick H. Boness, Municipal Attorney, Anchorage, for the Municipality of Anchorage; Margi A. Mock, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for the Alaska Public Defender Agency; Daniel S. Bair, Assistant Public Advocate, and Joshua P. Fink, Public Advocate, Anchorage, for the Alaska Office of Public Advocacy; Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the State of Alaska.

Before: COATS, Chief Judge, MANNHEIMER, Judge, and ANDREWS, Senior Superior Court Judge.*

### OPINION

MANNHEIMER, Judge.

This is an original application for relief brought by the victim of a crime. The application has two distinct parts.

The first part of this original application presents the question of whether a crime victim or, alternatively, the Alaska Office of Victims' Rights acting on behalf of a crime victim, has an independent right to seek appellate review of an alleged error in the sentence imposed on the perpetrator of the crime. The second part of this original application presents a more case-specific question: whether Cynthia Cooper is entitled to have a portion of the sentencing hearing sealed from public access.

The Municipality of Anchorage prosecuted Daniel R. Cooper Jr. for assaulting his wife, Cynthia Cooper. Daniel Cooper ultimately pleaded no contest to misdemeanor assault, and he received a suspended imposition of sentence conditioned on his satisfactory completion of 1 year's probation. One of Daniel's conditions of probation required him to attend a counseling program, but the program Daniel was ordered to attend is not one of the "batterer's intervention" treatment programs approved by the Alaska Department of Corrections. Cynthia Cooper (who is represented by the Office of Victims' Rights) takes the position that, under Alaska law (specifically, under AS 12.55.101(a)(1)), if a defendant convicted of a crime of domestic violence is ordered to participate in rehabilitative counseling or treatment as a condition of probation, this counseling or treatment must be a batterer's intervention treatment program approved by the Department of Corrections. Cynthia therefore contends that Daniel's sentence is illegal.

---

* Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

The Municipality disagrees with Cynthia's interpretation of this statute. The Municipality believes that Daniel's sentence is legal, and the Municipality has therefore declined to appeal the sentence.

After it became clear that the Municipality did not intend to challenge Daniel's sentence, Cynthia filed the present original application for relief. Cynthia contends that, because she is the victim of the crime, she has standing to challenge the district court's sentencing decision. That is, Cynthia asserts that, regardless of the Municipality's position on this matter, she has an independent right to seek appellate review of the sentence (either the right to appeal the sentence or, at least, the right to seek discretionary review of the sentence by filing an original application for relief).

The Office of Victims' Rights is representing Cynthia in this litigation. However, the Office of Victims' Rights argues that they are not merely Cynthia's attorney. Rather, the Office of Victims' Rights contends that, regardless of Cynthia's personal standing to pursue this litigation, the Office of Victims' Rights is independently authorized to pursue an appeal in any criminal case where the Office has appeared on behalf of the victim.

As explained above, the second part of this original application for relief presents the question of whether Cynthia is entitled to have a portion of the sentencing hearing sealed from public access.

The sentencing hearing in this case was open to the public when it was held; in fact, the hearing was attended by representatives of the media. During her sentencing argument, Daniel's defense attorney referred to the fact that Cynthia's son (who lived with the couple) was suffering from mental health and behavioral problems. The defense attorney argued that the boy's problems were a major source of stress in Cynthia's and Daniel's relationship, and that this stress was the primary contributing factor in Daniel's assaultive conduct.

On the Monday following the sentencing hearing, Cynthia—or, more precisely, the Office of Victims' Rights on Cynthia's behalf—filed a motion asking the district court to seal many of the defense attorney's statements on this subject. Cynthia contended that the defense attorney's statements contained information that was protected by the psychotherapist-patient privilege.

The district court declined to seal the defense attorney's statements—prompting Cynthia to supplement her original application for relief with a challenge to the district court's ruling.

For the reasons explained here, we conclude that Cynthia has no standing to challenge the sentence imposed by the district court, and that the Office of Victims' Rights has no independent standing to challenge the sentence either.

We further conclude, for two separate reasons, that the district court correctly declined to seal the defense attorney's statements at the sentencing hearing. First, with one possible exception, none of the challenged statements contained information protected by the psychotherapist-patient privilege. Second, neither Cynthia nor her attorney from the Office of Victims' Rights voiced a contemporaneous objection to these statements.

## Part I

*Does a crime victim or, alternatively, the Office of Victims' Rights, have standing to challenge the sentence imposed on the perpetrator of a crime?*

As explained above, both Cynthia Cooper and her attorney, the Office of Victims' Rights, wish to challenge the sentence imposed on Daniel Cooper because the district court failed to require Daniel to attend a Department of Corrections-approved batterer's intervention program.

Daniel takes the position that neither Cynthia nor the Office of Victims' Rights has standing to pursue an appeal or a petition challenging his sentence.

We solicited *amicus curiae* briefs from the Municipality of Anchorage, the Alaska Department of Law's Office of Special Prosecutions and Appeals, the Alaska Public Defender Agency, and the Alaska Office of Public Advocacy. All of these agencies take the position that neither a crime victim nor the Office of Victims' Rights has standing to

bring an appeal or a petition challenging the judgement entered against the defendant in a criminal case.

We also granted *amicus curiae* status to the National Crime Victim Law Institute, the Victim Advocacy and Research Group (a lawyers' organization that provides *pro bono* legal services to victims of violence and their care-givers), and the Alaska Network on Domestic Violence and Sexual Assault. These organizations support Cynthia's position that a crime victim has standing to pursue an appeal in a criminal case.

As we explain in more detail later in this opinion, courts from other states are unanimous in holding that a crime victim does not have the right to participate as an independent party in a criminal case. Many of these courts acknowledge that a crime victim *does* have standing to seek appellate relief if the trial court or an executive branch agency violates one or more of the procedural rights given to victims in a victims' rights act— generally, the right to advance notice of court proceedings, the right to be present during court proceedings, and the right to be heard before the court makes certain types of decisions. But these same courts agree that a crime victim is not an independent litigant in a criminal case, and that a crime victim does not have the right to challenge the propriety or legality of the substantive decisions made by the trial court—decisions such as what sentence should be imposed on the perpetrator of the crime.

For the reasons explained here, we agree with these courts that crime victims do not have an independent right to appeal the sentence imposed on the perpetrator of the crime. We also reject the contention of the Office of Victims' Rights that they have an independent right to challenge the decisions of the trial court in any case where the Office has appeared on behalf of a crime victim.

Accordingly, we dismiss Part I of this original application for relief.

*Underlying facts*

The Municipality of Anchorage prosecuted Daniel Cooper for assaulting his wife, Cynthia Cooper. This prosecution was ultimately resolved by a plea bargain. Under the terms of the agreement, Daniel agreed to plead no contest to one count of "family violence" under Anchorage Municipal Code § 8.10.050 (*i.e.*, domestic assault committed in the presence of minor children), with the further agreement that he would receive a suspended imposition of sentence with 1 year's probation. Apparently, Cynthia was consulted during the negotiation of this plea agreement.

When the Municipality and Daniel's defense attorney originally described the contemplated plea bargain to the district court, the defense attorney stated that one of Daniel's conditions of probation would be to "[complete a] domestic violence intervention program" within a year. However, when the parties later returned to court for Daniel's sentencing, it became clear that there was disagreement concerning exactly what kind of counseling or therapy Daniel would be obligated to pursue.

In advance of sentencing, Daniel had been participating in counseling with Dr. Keith Wiger. Even though Dr. Wiger's program was not approved by the Department of Corrections as a certified "domestic violence intervention program", Daniel's defense attorney told the sentencing judge—District Court Judge Gregory J. Motyka—that the plea agreement would allow Daniel to satisfy his counseling obligation by continuing in Dr. Wiger's program. The municipal prosecutor did not concede that the plea bargain (as originally negotiated) allowed this, but the prosecutor stated that the Municipality did not object to Judge Motyka's exercising discretion on the question of whether to order Daniel to continue with Dr. Wiger's program or, instead, order him to enroll in a domestic violence intervention program approved by the Department of Corrections.

This colloquy drew an objection from the attorney from the Office of Victims' Rights who was representing Cynthia Cooper. The Victims' Rights attorney declared that Cynthia had agreed to the plea bargain only because Daniel would be required to complete a DOC-approved domestic violence intervention program. The Victims' Rights attorney told Judge Motytka, "It's [Cynthia's] position that [the agreement as previously

stated in court] was a contract, ... and that the parties are now bound by that agreement."

Judge Motyka pointed out that no one was bound by any facet of the plea agreement until the agreement was formally accepted by the court. The Victims' Rights attorney conceded that this was correct. However, the Victims' Rights attorney argued that, under AS 12.55.101(a)(1), if the court ordered Daniel Cooper to attend any treatment "for the purpose of rehabilitat[ing] perpetrators of domestic violence", that treatment had to take place in a program approved by the Department of Corrections.

Judge Motyka asked the prosecutor if the Municipality still took the position that the question of domestic violence counseling or treatment would be "left to [the court's] discretion". The prosecutor said yes. Judge Motyka then declared that he disagreed with the Victims' Rights attorney's interpretation of the law; that is, Judge Motyka did not believe that AS 12.55.101(a) required him to impose a DOC-approved batterer's intervention program instead of some other form of rehabilitative treatment. And, when Judge Motyka ultimately imposed the terms of Daniel's probation, he allowed Daniel to continue attending Dr. Wiger's program.

After Judge Motyka sentenced Daniel, Cynthia filed a motion asserting that the counseling portion of Daniel's sentence was illegal. Judge Motyka refused to modify this aspect of the sentence, and Cynthia thereupon sought appellate review of Judge Motyka's decision.

*Alaska law defining the rights of crime victims*

Our system of criminal law has its roots in England. Originally, there was no criminal law "system" as we know it today—no network of police agencies and government prosecutors. When a crime was committed, it was up to the members of the community to apprehend the perpetrator, and (except in cases where the crime was of particular interest to the crown) it was up to the victim to prosecute the case in court.

The basic premise of this system was that criminal conduct constituted an injury to the victim—either to the victim's physical self, or to the victim's property, or to the victim's dependents. Thus, it was the victim's task to bring the perpetrator to court so that the perpetrator could be punished. As explained in Wayne R. LaFave, Jerold H. Israel, and Nancy J. King, *Criminal Procedure* (2nd ed.1999),

> [T]he English originally viewed the responsibility of the state for the administration of justice as "limited to providing means by which the injured person, or his kinsman or friends[,] might secure adequate redress without resorting to private warfare." When the Normans introduced the jury, they did not substantially alter that philosophy. They sought merely to gain the advantage of community knowledge of local events. As first established, jurors were neighbors who are likely to know something of the facts in question. They typically based their verdicts on their own knowledge and what they heard from their friends. As England moved from a rural to a more urbanized society, it was no longer possible to assume that jurors were self-informed. A method had to be developed for presenting the facts to the jury in the course of the trial. At that time, the English still had a strong tradition of private prosecution (although its underlying philosophy arguably had shifted the role of the private person from [seeking] personal vindication to assisting the state in redressing a wrong against the state), and the juries had already established the practice of hearing occasional witnesses. The natural progression, it is argued, was to move to an adversary trial in which both sides were allowed to present their own witnesses and to cross-examine the opposition's witnesses.

*LaFave*, § 1.4(c), Vol. 1, p. 177 n. 113 (citations omitted).

As *LaFave* indicates, the involvement of the state in this process was seen as a beneficial substitute for private retribution and vendetta. Although the victim personally prosecuted the case, a jury decided whether the defendant was guilty, and a judge imposed punishment on the guilty. Even so, "the early English view [was that] criminal

prosecution [was] a means of providing personal redress, with the person claiming to be the victim of a crime having personally to establish his right to redress." [1]

This was the system that the early American colonists imported from England:

> Under the English common law system that the colonists brought with them to this country, satisfaction of the victim's interest in gaining the conviction of the offender lay largely in the victim's own hands. With no organized police department, if investigation was needed to determine who had committed the crime, that task fell to the victim (unless the Crown had some special interest in the offense). Whatever governmental assistance was available often came at a fee, as did much private investigative assistance. Once the identity of the offender was determined, the victim had to arrange for the arrest and the issuance of the arrest warrant. Since the English common law system also relied primarily on private prosecution, the victim then bore the responsibility of presenting the prosecution [case] at trial....

*LaFave*, § 1.4(k), Vol. 1, pp. 209–210 (footnotes omitted). This system obviously favored the rich and powerful—those with sufficient influence and resources to apprehend the purported wrongdoer and to pursue the case in court.

But by the late eighteenth century, society's view of criminal conduct and the proper function of the criminal law had begun to change. Criminal conduct was no longer viewed as a private injury to the victim. Rather, crime was seen as an injury to the community. Criminal investigations were conducted by public police departments, and criminal prosecutions were brought by the state on behalf of the community as a whole.[2] It became the government's task to bring the wrongdoer to justice: government prosecutors, not crime victims, decided whether charges should be filed; likewise, if charges were filed, government prosecutors directed the litigation of those charges.

[During] the ... half century [following American independence], public prosecu-

tors gained a virtual monopoly over the decision to prosecute and the presentation of the prosecution [case] at trial. Most jurisdictions continued to permit private attorneys representing the victim to participate in the prosecution, but that practice ordinarily was dependent upon the permission of the prosecutor and was used primarily in misdemeanor cases. ...

Another somewhat later development impacting the victim's role was the establishment of the local police department. With the police department available to conduct investigations and make arrests, the victim's role in these aspects of the process was reduced dramatically. Victims were not legally precluded from either conducting investigations or making arrests, but the legal, economic, and other advantages enjoyed by the police made victim[s'] use of that authority impracticable in all but exceptional cases. In large part, the victims' actions at this stage of the process came to be limited to reporting offenses to the police and then providing such additional cooperation (*e.g.,* eye-witness identification) as the police might request.

*LaFave*, § 1.4(k), Vol. 1, pp. 210–11 (footnotes omitted).

Crime was no longer perceived as primarily an injury to the individual victim. Rather,

> Crime [was] now conceived of entirely in terms of an offense against society. The damage to the individual victim [was] incidental[,] and its redress [was] no longer regarded as a function of the criminal justice process. Rather, it [was] separated off and ... treated as a matter of civil justice. While the victim [was] allowed to decide what [should] be done with the case as a civil matter[,] ... the criminal case belong[ed] solely to the state and public officials.

*LaFave*, § 1.4(k), Vol. 1, p. 211 (quoting William McDonald, "Towards a Bicentennial Revolution in Criminal Justice: The Return of the Victim", 13 Am.Crim. L.Rev. 649, 650 (1976)).

---

1. *LaFave*, § 1.4(d), Vol. 1, p. 189.

2. *LaFave*, § 1.4(d), Vol. 1, p. 189.

By the twentieth century, it was firmly established that "in American jurisprudence ..., a private citizen lacks a judicially cognizable interest in the [criminal] prosecution or nonprosecution of another...." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973).

Obviously, this meant that there would be times when government prosecutors would be at odds with crime victims. The government prosecutor might not view the facts in the same way as the victim, and thus the prosecutor might conclude that no crime had been committed. Or the prosecutor might agree that a crime had probably been committed, but nevertheless conclude that the case could not be proved in court. Or the prosecutor might disagree with the victim concerning the proper charges to file against the defendant. Or, after charges were filed and the case brought to court, the prosecutor might disagree with the victim concerning how the case should be litigated, or whether (and on what terms) the case should be settled, or what punishment should be sought in the event of the defendant's conviction.

It was not that lawmakers failed to recognize these potential conflicts. Rather, it was perceived that these problems were outweighed by the societal benefits of having an objective government official, as opposed to a person whose personal interests were at stake, decide whether a citizen should be charged with a crime, and what that charge should be, and how that charge should be litigated or settled.

And yet, in the latter part of the twentieth century, some people began to call for a re-evaluation of the victim's role—or, more precisely, non-role—in this modern system. The reformers asserted that, because crime victims had no right to actively participate in the criminal justice process, the criminal justice system had stopped paying sufficient attention to the people harmed or threatened by criminal conduct. Responding to this criticism, various states enacted statutes or constitutional amendments (or both) which were (in the words of the Massachusetts Supreme Court) "intended to change the traditional [role] of victims from virtually silent observers to active participants in the criminal justice process".[3]

In Alaska, these reform efforts led to the amendment of our statutes governing criminal procedure and, later, to the amendment of our state constitution.

In 1989, the Alaska Legislature enacted the Crime Victims' Rights Act.[4] The section of this act that enumerates victims' rights, AS 12.61.010, provides (among other things) that a crime victim has the same right as the defendant to be present at court hearings[5] and the right to be notified of these court hearings,[6] as well as the right to make a written or oral statement for use in preparation of the pre-sentence report in felony cases,[7] and the right to appear personally at the defendant's sentencing hearing and to present a written statement and/or make a sworn or unsworn oral presentation at that hearing.[8]

Five years later, in 1994, a victims' rights section (Section 24) was added to Article I of the Alaska Constitution.[9] Article I, Section 24, states:

> Crime victims, as defined by law, shall have the following rights as provided by law: the right to be reasonably protected from the accused through the imposition of appropriate bail or conditions of release by the court; the right to confer with the prosecution; the right to be treated with dignity, respect, and fairness during all phases of the criminal and juvenile justice process; the right to timely disposition of the case following the arrest of the accused; the right to obtain information about and be allowed to be present at all

---

3. *Hagen v. Commonwealth*, 437 Mass. 374, 772 N.E.2d 32, 38 (2002) (internal quotations omitted).

4. SLA 1989, ch. 59.

5. AS 12.61.010(a)(1).

6. AS 12.61.010(a)(2)-(3).

7. AS 12.61.010(a)(8).

8. AS 12.61.010(a)(9).

9. *See* Legislative Resolve No. 58 of the 18th Alaska Legislature, section 2.

criminal or juvenile proceedings where the accused has the right to be present; the right to be allowed to be heard, upon request, at sentencing, before or after conviction or juvenile adjudication, and at any proceeding where the accused's release from custody is considered; the right to restitution from the accused; and the right to be informed, upon request, of the accused's escape or release from custody before or after conviction or juvenile adjudication.

Cynthia Cooper and the Office of Victims' Rights rely on this section of the constitution, as well as the provisions of the Alaska Victims' Rights Act quoted above, to support their contention that the victim of a crime and/or the Office of Victims' Rights are authorized to seek appellate review of a sentencing judge's decision.

*Under Alaska law, does a victim of a crime have an independent right to appeal the sentence imposed on the perpetrator of the crime?*

As we have just explained, a crime victim in Alaska now has the right to attend all the proceedings that the defendant has the right to attend, and a crime victim has the right to provide input before certain decisions are made—in particular, the decision as to what sentence a convicted defendant should receive. But neither Article I, Section 24 of the Alaska Constitution nor the Victims' Rights Act (AS 12.61) expressly gives crime victims the right to intervene in the litigation of a criminal case—in the sense of determining what charges should be brought, or determining how those charges should be litigated or settled, or determining whether the prosecutor should seek appellate review of particular judicial decisions.

Moreover, as we explained earlier, the case presently before us involves a situation where the prosecuting authority (the Municipality of Anchorage) does not believe that the challenged judicial decision was illegal or adverse to the government's interests. At the sentencing hearing, when it appeared that the plea bargain might unravel over the issue of court-ordered treatment, the prosecutor took the position that Judge Motyka would be acting within his lawful authority if he declined to order Daniel Cooper to attend a DOC-approved batterer's intervention program.

Thus, by bringing this original application for relief, Cynthia Cooper is not merely pursuing a legal claim that the prosecutor has declined to pursue. Rather, she is pursuing a legal claim that is adverse to the declared interests of the Municipality of Anchorage— because a decision in her favor might lead to a motion by Daniel Cooper to withdraw from the plea agreement.

Although Alaska law does not expressly give crime victims the right to appeal a defendant's sentence, Cynthia Cooper contends that this right is implicit in one or more clauses of Article I, Section 24 or AS 12.61.010.

*(a) Cynthia Cooper's argument that the district court's imposition of an allegedly illegal sentence violates her right to a timely disposition of the criminal case*

■ Cynthia points out that Article I, Section 24 of the Alaska Constitution gives crime victims the right to "timely disposition of [a criminal] case following the arrest of the accused". As explained earlier in this opinion, Cynthia claims that, under Alaska sentencing law, once Judge Motyka made the decision to order Daniel Cooper to attend rehabilitative treatment as a condition of probation, the judge was obliged to order Daniel to attend a DOC-approved batterer's intervention program. Cynthia argues that, because Judge Motyka failed to do this, Daniel Cooper's sentence is illegal. Then, relying on appellate decisions which declare that an illegal sentence is not "meaningfully imposed", Cynthia argues that Daniel has never been "meaningfully" sentenced—and, thus, that she (Cynthia) has been denied her right (as a crime victim) to a "timely disposition" of this case.

It is true that, in prior decisions, this Court has repeatedly declared that, to the extent a sentence is illegal, it has not been "meaningfully imposed".[10] But these deci-

**10.** *See, e.g., Smith v. State,* 892 P.2d 202, 203–04 (Alaska App.1995); *Dunham v. Juneau,* 790 P.2d

sions involved the question of whether the illegal portion of the sentence could be adjusted or corrected to the defendant's detriment, despite the fact that the double jeopardy clause normally precludes a court from adjusting a defendant's sentence upward once it has been imposed. In this context, when we declared that the illegal sentence (or the illegal portion of the sentence) had not been "meaningfully imposed", we were saying that the double jeopardy clause did not forbid adjustment of the sentence (or the challenged portion of the sentence) to the defendant's detriment.

This is quite different from asserting that a defendant who receives an illegal (or partially illegal) sentence has never really been sentenced for any purpose. The fact that there may be a legal defect in the defendant's sentence does not mean that the sentencing was a complete nullity, nor does it mean that a victim's right to a timely disposition of the criminal case has been violated.

A victim's right to a timely disposition of a criminal case is satisfied if the proceedings take place in a timely manner, even if an appellate court later concludes that the proceedings were flawed and must be repeated. In the present case, even if we assume for purposes of argument that one aspect of Daniel Cooper's sentence was illegal (the portion directing him to complete his treatment with Dr. Wiger rather than engaging in treatment at a DOC-approved batterer's intervention program), and even if we assume that the double jeopardy clause would allow correction of this purported flaw, the fact remains that the sentencing did take place. Cynthia's right to a timely disposition of the case was therefore satisfied.

See *Hagen v. Commonwealth*, 437 Mass. 374, 772 N.E.2d 32, 36 (2002), where the Massachusetts Supreme Court said:

> We conclude that[, by guaranteeing crime victims a right to prompt disposition of criminal charges,] the Legislature sought to assure for victims a prompt disposition within the context of the trial process.... In the present case, the defendant was tried and sentenced within one year of

239, 240–41 (Alaska App.1990); *State v. Laporte,*

[his] indictment.... The statutory requirement of a "prompt disposition" thus has been satisfied.

For these reasons, we reject Cynthia's contention that the entry of judgement against a criminal defendant does not constitute a "disposition" of the case if there is an attackable flaw in the sentencing judge's decision.

> *(b) Cynthia Cooper's argument that, because crime victims have a constitutional and statutory right to be heard at the sentencing hearing, crime victims must have the right to independently challenge the sentencing judge's decision if the victim concludes that the sentence is illegal*

Cynthia's next argument is based on the fact that the Alaska Constitution and the Alaska Victims' Rights Act give crime victims the right to be heard at sentencing—that is, the right to provide input before the judge decides what sentence the defendant should receive. Cynthia argues that a crime victim must have a corresponding right to appeal the judge's sentencing decision if the victim concludes that the judge has imposed an illegal sentence.

To properly analyze this argument, it is crucial to distinguish between, on the one hand, a crime victim's acknowledged procedural rights to attend the sentencing proceedings and to provide input before the judge makes the sentencing decision and, on the other, the right asserted by Cynthia Cooper in this litigation: the asserted right to intervene in the lawsuit and independently demand or seek appellate review of the judge's sentencing decision.

In her brief to this Court, Cynthia cites several appellate decisions from other states that have enacted victims' rights laws. She claims that these courts have recognized a crime victim's standing to litigate various claims based on their states' victims' rights acts.

Cynthia's brief contains a mistaken analysis of some of these appellate decisions. For example, Cynthia claims that the New Jersey Supreme Court held in *State v. Timmendequas*, 161 N.J. 515, 737 A.2d 55, 75–76 (1999),

672 P.2d 466, 468–69 & n. 6 (Alaska App.1983).

that, because crime victims in New Jersey have a constitutional right to attend the trial, a crime victim has standing to object to a defendant's request for change of venue if the new location would pose a substantial obstacle to the victim's attending the trial. This is a misreading of the New Jersey court's decision. The *Timmendequas* decision merely holds that it is not improper for a trial judge to take account of the inconvenience that a change of venue would pose to the crime victim, "*provided* that the constitutional rights of the defendant are not denied or infringed on by [the judge's] decision".[11]

Moreover, in the *Timmendequas* case, it was the prosecutor who addressed the trial judge and articulated the victim's concerns.[12] Thus, *Timmendequas* does not even reach the narrower question of whether the victim was personally entitled to be heard on this issue if, for some reason, the prosecutor did not share the victim's position.

Similarly, in *State in the Interest of K.P.*, 311 N.J.Super. 123, 709 A.2d 315 (1997), the question was whether a juvenile court judge, when deciding whether to grant a media request to open the proceedings to the public, could lawfully consider the victim's opposition to this request—an opposition that was presented by the prosecuting attorney.

It is true that the New Jersey court worded its decision in terms of the victim's "standing", but the issue was not the victim's standing as a party to the lawsuit, but rather whether the court could lawfully consider the victim's position when ruling on a non-party newspaper's request to open the proceedings to the media. As stated by the New Jersey court, "[t]he issue [was to identify] the factors [that] the court may [properly] consider [when] exercising its discretion." [13]

The New Jersey court did not reach the issue of whether the victim might have the right to seek appellate review of an adverse decision. Moreover, as was the case in *Timmendequas*, it was the prosecutor who addressed the judge and articulated the victim's concerns.[14] Thus, like *Timmendequas*, the decision in *Interest of K.P.* does not reach the narrower question of whether the victim would have been personally entitled to be heard on this issue if the victim and the prosecutor had been at odds.

Cynthia cites *Melissa J. v. Superior Court*, 190 Cal.App.3d 476, 237 Cal.Rptr. 5 (1987), as a case in which a court recognized a crime victim's standing to sue to protect their procedural rights. This is correct: in *Melissa J.*, the California Court of Appeal held that a crime victim is entitled to notice and a right to be heard before the sentencing judge terminates or reduces the defendant's previously imposed obligation to pay restitution; the court also held that a crime victim has standing (after exhausting trial court remedies) to ask an appellate court to enforce this procedural right.[15] However, while the California court concluded that a crime victim could seek an appellate remedy for an improper abridgement of their procedural right to be heard, the court also noted that a crime victim "is not considered a party to [the] criminal proceeding".[16]

Returning to the present case, we conclude that this case does not require us to decide whether Alaska law would likewise recognize a crime victim's standing to sue to enforce the procedural rights specified in Article I, Section 24 of our state constitution or in AS 12.61.010—because, in the present case, those rights were honored. Cynthia Cooper was notified of the trial court proceedings, she attended those proceedings (along with her lawyer from the Office of Victims' Rights), and she was allowed to present her views to the sentencing judge (both personally and through her lawyer).

Rather, the question before us is whether, if a crime victim's procedural rights have been honored but the victim is dissatisfied with the sentencing judge's substantive decision, the victim may independently seek ap-

---

**11.** *Timmendequas,* 737 A.2d at 76 (emphasis in the original).

**12.** *Id.* at 74–75.

**13.** *Interest of K.P.,* 709 A.2d at 316.

**14.** *Id.* at 316–17.

**15.** *Melissa J.,* 237 Cal.Rptr. at 6–7.

**16.** *Id.* at 6.

pellate review of that decision. American courts are unanimous in answering "no" to this question.

For example, in *State v. Lamberton*, 183 Ariz. 47, 899 P.2d 939 (1995), the Arizona Supreme Court acknowledged that a crime victim would have standing to seek appellate review if the crime victim was denied one or more of the rights enumerated in Arizona's Victims' Rights Act. *Id.* at 942. At the same time, however, the Arizona court held that a crime victim had no standing to seek appellate review of a trial court's decision to grant the defendant's petition for post-conviction relief and to order re-sentencing. *Id.* at 942–43.

The Maryland Court of Appeals (that state's highest court) reached the same decision in *Cianos v. State*, 338 Md. 406, 659 A.2d 291 (1995). The court held that a crime victim is not a party to the criminal litigation, and that the victim has no right to appeal the judgement entered against the defendant. Like the Arizona court, the Maryland court acknowledged that a crime victim could seek appellate enforcement of the rights granted by Maryland's Victims' Rights Act. But the Maryland court declared that any such appeal "is collateral to[,] and may not interrupt[,] a criminal case", nor can judicial review of a victims' rights violation "result in reversal of the judgment [or] a reopening of the [underlying criminal] case". *Id.* at 293–94.

In *Dix v. Superior Court*, 53 Cal.3d 442, 279 Cal.Rptr. 834, 807 P.2d 1063 (1991), the California Supreme Court held that a crime victim has no right to object to a prosecutor's decision to ask the sentencing judge to "recall" (*i.e.,* vacate) a defendant's sentence and to allow the defendant to be re-sentenced at a later time, so that the defendant could testify against other offenders and thus, potentially, earn a reduction of his sentence. The California Supreme Court declared that "[e]xcept as specifically provided by law, a private citizen has no personal legal interest in the outcome of an individual criminal prosecution against another person.... [T]he victim of the crime is not a party." [17]

In *Dix*, the crime victim argued that the contemplated "recall" of the defendant's sentence would jeopardize the victim's personal safety, since the defendant had allegedly threatened the victim with future harm.[18] The crime victim pointed out that the California Constitution had been amended in 1982 to guarantee crime victims the right to appropriate detention, trial, and punishment of criminal offenders. The victim argued that, because of the threat to his personal safety, any "recall" of the defendant's sentence would violate those rights.[19] The California court answered:

> The [California] Constitution and statutes do accord individual felony victims certain "rights" of a ... specific and personal nature. These include the "right" to restitution in appropriate circumstances, and [the right] to receive notice, appear [in court], and state [their] views in connection with disposition and sentencing. [But] whatever special considerations of standing may apply to this limited category of "victims' rights", ... [w]e hold that [the victim] has no personal "right" or "interest" which would permit his intervention in the decision [whether] to recall [the defendant's] sentence.

*Dix*, 279 Cal.Rptr. at 838, 807 P.2d at 1067.

Having lost his argument to the California Supreme Court, the crime victim in *Dix* then took his case to the federal courts. In *Dix v. County of Shasta*, 963 F.2d 1296, 1298–1300 (9th Cir.1992),[20] the Ninth Circuit held that crime victims have no federal due process interest in the incarceration of criminals, even when their state has enacted a victims' rights act.

Similarly, in *Gansz v. People*, 888 P.2d 256, 257–59 (Colo.1995), the Colorado Supreme Court held that, despite the enactment of a victims' rights amendment, the Colorado

**17.** *Dix*, 279 Cal.Rptr. 834, 807 P.2d at 1066 (citations omitted).

**18.** *Id.*

**19.** *Id.* at 1067.

**20.** *Overruled on other grounds in Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

Constitution still does not give crime victims the right to appeal a court's dismissal of criminal charges. In *Johnston v. State*, 702 N.E.2d 1085, 1088 (Ind.App.1998), the Indiana Court of Appeals held that crime victims have no standing to contest a sentencing judge's decision to grant a downward modification of a defendant's sentence.[21] In *State v. Barnett*, 980 S.W.2d 297, 308 (Mo. 1998), the Missouri Supreme Court held that, despite the procedural rights guaranteed to crime victims by the Missouri Victims' Rights Act, crime victims have no right to dictate the prosecutor's charging decision, nor do they have standing to object to the judge's sentencing decision.

Another decision reaching this same conclusion is *Reed v. Becka*, 333 S.C. 676, 511 S.E.2d 396 (App.Ct.1999), where the South Carolina Supreme Court held that a crime victim has no right to veto a plea agreement and force the prosecutor to renew the negotiations or take the defendant to trial. The South Carolina court acknowledged that South Carolina's Victims' Rights Act gives crime victims the right to confer with the prosecuting attorney concerning any contemplated plea agreement.[22] Nevertheless, the court declared, a crime victim "possesses no rights in the appellate process", nor any "right to veto a proposed plea agreement":[23]

> Nothing in our Constitution or statutes provides the "victim" standing to appeal the trial court's order [accepting the proposed plea agreement]. [While] the rights granted by the South Carolina Constitution and statutes are enforceable by a writ of mandamus, [these provisions of law do not confer a right of] direct participation at the trial level.

*Reed v. Becka*, 511 S.E.2d at 399.

*See also State v. Martineau*, 148 N.H. 259, 808 A.2d 51, 53–54 (2002), and *State ex rel. Wild v. Otis*, 257 N.W.2d 361, 364–65 (Minn. 1977).

*Amicus curiae* Victim Advocacy and Research Group contends that one court—the Massachusetts Supreme Court—has held

that crime victims have standing to intervene in criminal litigation and independently challenge the rulings of the trial court. The Victim Advocacy and Research Group claims that the Massachusetts court recognized a crime victim's standing in *Hagen v. Commonwealth*, 437 Mass. 374, 772 N.E.2d 32 (2002). We disagree. Here is the pertinent language from *Hagen*:

> [T]he victim of a crime does not have a judicially cognizable interest in the prosecution of another. The rights which [the victim in this case] seeks to enforce ... are not private but in fact are lodged in the Commonwealth. A [criminal] prosecution is conducted in the interests of the Commonwealth, not on behalf of the victim.... The district attorney is the elected advocate of the people for a broad spectrum of societal interests—from ensuring that criminals are punished for wrongdoing, to allocating limited resources to maximize public protection....
>
> [N]othing in [the Massachusetts Victims' Rights Act] either alters our long-standing jurisprudence that the victim of a crime does not have a judicially cognizable interest in the prosecution of another or confers on a victim the status of a party to the criminal proceeding[.]

*Hagen*, 772 N.E.2d at 37–38 (citations and internal quotations omitted).

Although the *Hagen* decision appears to firmly reject the idea that crime victims have standing in criminal cases, the Victim Advocacy and Research Group argues that "[t]he language of the [*Hagen* ] decision ... is ... misleading"—that the Massachusetts court actually recognized a crime victim's standing, but the court "soft-pedaled its ruling" for political reasons.

The Victim Advocacy and Research Group supports this argument by pointing out that, in Justice Cowin's concurring opinion in *Hagen*, she criticized her colleagues for "creat[ing] a right of victims to participate in

---

21. *Affirmed in part, Johnston v. Dobeski*, 739 N.E.2d 121, 123 (Ind.2000).

22. *Reed v. Becka*, 511 S.E.2d at 400.

23. *Id.* at 399, 400.

the proceeding as a nonparty".[24] But Justice Cowin was not speaking of a victim's right to independently challenge the rulings of the trial court. Rather, she was criticizing the *Hagen* majority for suggesting that crime victims have the right to personally address the trial judge before the judge makes decisions that involve any of the rights guaranteed by the Massachusetts Victims' Rights Act.

The majority in *Hagen* declared that "victims should be permitted an opportunity to address the [trial] court directly when their fundamental right to a prompt disposition is jeopardized."[25] Justice Cowin believed that this was an unwarranted expansion of the Massachusetts Victims' Rights Act. She took the position that, except in situations where a victim's right to independently address the court is expressly granted (for instance, the victim's right to speak at the sentencing hearing),[26] the Victims' Rights Act should not be interpreted as conferring on victims the right to personally address the court. Rather, Justice Cowin argued, crime victims who wish to express their position on other subjects affecting their rights must "seek assistance from the victim and witness board, the district attorney[,] or the Attorney General, none of whom is required to assist the victim in this specific regard."[27]

To sum up: Many states have enacted victims' rights acts, either by constitutional amendment or by legislation or both. And among these states, many courts are prepared to recognize a crime victim's standing to sue for enforcement of the procedural rights granted by the victims' rights act—the rights to notice, to attend court proceedings, and to offer their views on certain decisions (especially sentencing and parole release). But no court has endorsed the position espoused by Cynthia Cooper in this appeal— the position that the enactment of a victims' rights act gives crime victims the right to participate as independent parties to a crimi-

nal prosecution or to otherwise challenge the substantive rulings of the trial court.

We agree with the reasoning of the court decisions discussed above—in particular, the distinction these courts have drawn between, on the one hand, protecting a crime victim's procedural rights and, on the other hand, allowing crime victims to participate as independent parties in criminal prosecutions.

Under Alaska law, crime victims are guaranteed the right to attend a defendant's sentencing hearing and to offer their views regarding the sentence that the defendant should receive. It may well be (although we do not decide this issue) that if a court failed to honor these rights, a crime victim would be entitled to ask an appellate court to issue a writ of mandamus—that is, an order directing the trial court to let the victim exercise these rights.

But as we explained above, the present case does not involve an infringement of Cynthia Cooper's right to attend Daniel Cooper's sentencing hearing and to offer her views regarding the proper sentence. These rights were fully honored.

Instead, Cynthia asserts that a victim's right to be heard at the sentencing hearing necessarily carries with it the right to challenge the sentencing judge's decision if the victim believes that the judge imposed an unlawful sentence. But the fact that a person or organization is legally entitled to express their views in court does not necessarily mean that this person or organization is also entitled to appeal the court's decision if the court does not adopt their view of the facts or their view of the law.

For instance, Alaska law calls for the Department of Corrections to prepare a pre-sentence report in all felony cases.[28] In that pre-sentence report, the Department of Corrections offers its conclusions regarding the facts of the case and often expresses its view

---

24. *Hagen,* 772 N.E.2d at 38.

25. *Id.* at 38.

26. *See* Massachusetts General Law 258B, § 3(p), which declares that crime victims have the right "to be heard through an oral and written victim impact statement at sentencing[,] ... about the

effects of the crime on the victim and as to a recommended sentence...."

27. *Id.* at 39.

28. Alaska Criminal Rule 32.1(b)(1).

regarding the sentence that should be imposed. Even though the Department's view may not necessarily coincide with the positions taken by either the prosecuting attorney or the defense attorney, no one has suggested that the Department of Corrections has an independent right to appeal the court's sentencing decision if the sentencing judge does not adopt the Department's view.

The same thing is true with regard to the right of crime victims to appear at the sentencing hearing and express their views concerning the proper sentence. Alaska law guarantees crime victims the right to provide this input when the judge is making the sentencing decision, but the law does not guarantee crime victims a right to attack the sentencing decision if the judge fails to adhere to the crime victim's views regarding the proper sentence.

*(c) Cynthia Cooper's argument that, unless crime victims have a right to appeal, prosecutors and defense attorneys will collude with sentencing judges to evade and defeat the rights of crime victims*

■ Cynthia Cooper, and the various *amici curiae* allied with her, contend that if this Court does not allow her to independently challenge the district court's sentencing decision, we will (in effect) be authorizing prosecutors and defense attorneys to collude with trial court judges to circumvent the law—for example, by agreeing to unlawful settlements of criminal cases in which the defendant is not required to suffer the full penalty provided by law for their crime, or is not required to participate in rehabilitative programs specified by law.

We need not reach the question of what this Court would do if the record of the trial court proceedings demonstrated this type of flagrant misconduct. In the present case, there was no flagrant misconduct. In fact, there was no misconduct at all.

Cynthia Cooper and the Office of Victims' Rights assert that (1) Judge Motyka concluded that Daniel Cooper's conditions of probation should include a program of rehabilitative counseling or treatment for batterers,

and that (2) once Judge Motyka reached this conclusion, the judge could not lawfully allow Daniel to pursue this rehabilitative counseling or treatment by attending Dr. Wiger's program—because Dr. Wiger's program is not approved by the Department of Corrections. Cynthia and the Office of Victims' Rights argue that, under AS 12.55.101(a), Judge Motyka was obliged to order Daniel to attend a DOC-approved batterer's intervention program.

The pertinent portion of AS 12.55.101(a) reads:

> If a person convicted of a crime involving domestic violence is placed on probation, the court . . . may
>
> (1) require the defendant to participate in and complete to the satisfaction of the court one or more programs for the rehabilitation of perpetrators of domestic violence that meet the standards set by, and that are approved by, the Department of Corrections under AS 44.28.020(b), if the program is available in the community where the defendant resides; the court may not order a defendant to participate in or complete a program for the rehabilitation of perpetrators of domestic violence that does not meet the standards set [by], and that is not approved [by,] the Department of Corrections under AS 44.28.020(b).

As can be seen, the statute says that the sentencing judge "may require" the defendant to attend a batterer's intervention program. Generally, the legislature's use of the word "may" means that an action is permitted but not required.[29]

Cynthia concedes that the statute gives sentencing judges discretion on this point. She argues, however, that once a sentencing judge concludes that a defendant should participate in a program for the rehabilitation of domestic violence offenders, the statute limits the judge's discretion concerning the particular program that the defendant is ordered to attend.

Cynthia asserts that, in the present case, "the prosecution, the defense, and the judge all agreed that [Daniel] Cooper needed a

---

**29.** *See, e.g., Wongittilin v. State,* 36 P.3d 678, 682    (Alaska 2001).

rehabilitation program to deal with his domestic violence and abuse". Accordingly, Cynthia argues, Judge Motyka was required to specify a batterer's intervention program approved by the Department of Corrections.

Cynthia's argument hinges on the underlying premise that any rehabilitative program designed to cure or counteract a defendant's propensity to commit acts of domestic violence must be deemed a "batterer's intervention" program of the sort that AS 12.55.101(a) addresses. We do not agree with this premise.

Initially, we note that the definition of "crime involving domestic violence" is quite broad. AS 12.55.185(4) declares that, for purposes of the sentencing statutes, "domestic violence" has the meaning given in AS 18.66.990. In prior decisions—chiefly, *Bingaman v. State*, 76 P.3d 398, 407 (Alaska App.2003), and *Carpentino v. State*, 42 P.3d 1137, 1141 (Alaska App.2002) (opinion on rehearing)—we have explained how the definition of "domestic violence" codified in AS 18.66.990 is much broader than what most people would think.

The phrase "domestic violence" is normally understood to mean an assault committed by one domestic partner against another. But under AS 18.66.990, this phrase is defined in a wide-ranging way, quite divorced from its everyday meaning:

> For example, if an elderly uncle comes to visit his favorite nephew and, while lighting his pipe, recklessly scorches a table cloth or a chair, the old man has seemingly just committed an act of "domestic violence" as defined in AS 18.66.990(3). That is, the uncle has committed the listed offense of criminally negligent burning under AS 11.46.430 (negligently damaging the property of another by fire), and the victim is related to the perpetrator within the fourth degree of consanguinity—thus qualifying them as "household members" under AS 18.66.990(5)(E).

> Similarly, if a group of former college roommates decide to hold a twenty-year reunion at one of their homes, and if one of the visiting former roommates gets drunk and recklessly jams his friend's CD player while trying to insert a CD into it, this roommate has seemingly just committed an act of "domestic violence". The intoxicated roommate has committed the listed offense of fourth-degree criminal mischief under AS 11.46.486(a)(1) (tampering with the property of another with reckless disregard for the risk of harm or loss), and all of the former college roommates are "household members" under AS 18.66.990(5)(B).

*Carpentino*, 42 P.3d at 1141.

Similarly, "a person who causes a traffic accident through criminal negligence and, by chance, happens to injure the child of a former high school sweetheart has committed a 'crime involving domestic violence' as defined in AS 18.66.990." *Bingaman*, 76 P.3d at 412.

Because the definition of "crime involving domestic violence" is so expansive—because it encompasses many situations that have nothing to do with an assault by one domestic partner against another—there will be many cases in which, even though the defendant's crime may qualify as a "crime involving domestic violence", it makes no sense to require the defendant to undergo batterer's intervention treatment.

Second, even in cases of typical "domestic violence", where one domestic partner has in fact assaulted another, there will be times when the sentencing judge may reasonably conclude that a batterer's intervention treatment program is not the answer. For instance, the judge may conclude that the defendant's assaultive conduct arose from a major mental illness (for instance, schizophrenia), or that the assaultive conduct was the one-time product of a specific emotional stress (for example, the loss of a career or the loss of a child).

In such circumstances, the sentencing judge might reasonably conclude that, rather than sending the defendant to a batterer's intervention program (that is, a program designed to address the possessive, controlling, and manipulative behaviors that typify batterers), it would be more productive to order the defendant to engage in other kinds of treatment. And because there will be such cases, it makes sense for the legislature to allow the sentencing judge to evaluate each

case on its own merits, rather than requiring judges to send all defendants to complete a batterer's intervention treatment program.

In the present case, the defense attorney argued that Daniel Cooper had not committed acts of violence before, and that the present case was "an anomaly". The defense attorney also argued that it was important for Daniel to continue participating in Dr. Wiger's program because "abuse is not his only issue".

Shortly before Judge Motyka imposed Daniel's sentence, the judge declared that, given the facts of the case, he did not believe that AS 12.55.101(a) required him to send Daniel to a batterer's intervention program:

> *The Court:* [The violence committed on the victim in this case was], at best, a slap. It [was] an act done by a 57–year–old man with no priors, [no] alcohol or anger convictions. Minimal injur[y]. And if you took [away] all the bad blood, what you would have is a first-time offender pleading [no contest] to family violence.... I don't agree with [the Office of Victims' Rights' contention] that [the statute] requires a DVIP [*i.e.,* a domestic violence intervention program] in this [situation].

Based on this record, it appears that Judge Motyka concluded that a batterer's intervention program was not the best treatment for Daniel Cooper, and that Daniel should instead be ordered to complete Dr. Wiger's program.

For these reasons, we reject Cynthia Cooper's argument that the prosecutor, the defense attorney, and Judge Motyka colluded to circumvent the statute. We also reject Cynthia's argument that Judge Motyka found that Daniel needed to attend a batterer's intervention program, but then violated the statute by sending Daniel to a batterer's intervention program that was not DOC-approved. Rather, the record shows that Judge Motyka concluded that Daniel should be sent to Dr. Wiger's program *instead of* a batterer's intervention program.

> *(d) Cynthia Cooper's argument that a crime victim must be able to appeal a judge's decision if the judge fails to give sufficient consideration to any of the interests of crime victims enumerated in the Alaska Constitution and the Alaska Statutes*

■ Finally, Cynthia Cooper argues that crime victims must have the right to appeal whenever a judge fails to sufficiently consider any of the interests of crime victims guaranteed by law—*i.e.,* the interests enumerated in Article I, Section 24 of the Alaska Constitution and in various provisions of the Alaska Statutes.

Cynthia points out that Article I, Section 24 guarantees the right of crime victims to be treated with "fairness during all phases of the criminal ... justice process". Cynthia argues that this right to be treated with fairness must encompass the right to insist on enforcement of all of the provisions of the Alaska Statutes that speak to the interests of crime victims.

For instance, with regard to the present case, AS 12.55.101(a) declares that when a sentencing judge is considering whether to grant probation to a defendant convicted of a crime of domestic violence, the judge is obliged to consider "the safety and protection of the victim and any [other] member of the victim's family". Cynthia argues that, because of this statutory mandate (coupled with the constitutional guarantee of fair treatment for crime victims), a victim of domestic violence must have the right to appeal a sentencing judge's decision if the judge imposes a sentence that does not (in the victim's estimation) adequately guarantee the safety and protection of the victim and the other members of the victim's family.

In the present case, Cynthia contends that Judge Motyka failed to give adequate consideration to her safety and the safety of her children when the judge declined to order Daniel to participate in a batterer's intervention program. Cynthia argues that Judge Motyka, in making this decision, improperly disregarded her safety—and thus violated AS 12.55.101(a)—"by failing to ensure that [Daniel] receive[d] appropriate rehabilitat[ive] treatment]".

Several provisions of the Alaska Statutes require judges to consider the interests of crime victims before making certain deci-

sions. One example is AS 12.55.101(a). Another example is AS 12.30.027(a), which states that before a court orders the pre-trial or post-trial bail release of a defendant prosecuted for a crime of domestic violence, the court must "consider the safety of the alleged victim or other household member".

But we do not read these statutes to mean that crime victims are to be deemed parties to the criminal prosecution of the perpetrator. Nor do we read these statutes as demonstrating the legislature's intent to have crime victims file appeals whenever they are dissatisfied with a judge's weighing of their interests.

Our conclusion regarding the legislature's position on this issue is confirmed by actions the legislature took during its 2005 session. In that 2005 legislative session, a bill was introduced—House Bill 55—relating to the rights of crime victims. Under House Bill 55, a new statute (AS 12.61.013) would have been enacted giving crime victims the right to petition the superior court or the district court "for an order restraining [the] violation or compelling [the] implementation of [any of the] rights granted to victims by regulation, statute, or constitutional provision".[30] If the victim was dissatisfied with the trial court's ruling, the victim could then appeal the trial court's decision to this Court.[31] The proposed statute would also have required an expedited appellate process, as well as relaxation of the appellate rules governing the form and content of briefs and other documents.[32]

The legislature took no action on House Bill 55. Instead, the legislature enacted a more modest proposal giving crime victims the right to seek appellate review of one particular type of sentencing decision: the right to petition this Court to review any felony sentence which, because of the mitigating factors listed in AS 12.55.125(d), has been reduced below the presumptive range for that crime.[33] *See* AS 12.55.120(f).

Under this legislation, a crime victim's right to petition for review of the defendant's sentence applies only to felony cases—because only felony offenses carry a presumptive range of sentences. The case presently before this Court involves a misdemeanor sentence. Thus, the legislature's recent enactment of AS 12.55.120(e) does not aid Cynthia Cooper's argument that she is entitled to seek appellate review of Judge Motyka's sentencing decision.

In fact, the legislature's enactment of a statute of such limited scope severely undercuts Cynthia's contention that the legislature has granted crime victims broad, independent authority to challenge any sentencing decision. The legislature's passage of House Bill 54, coupled with its failure to take action on House Bill 55, indicates that the legislature purposely declined to pass legislation that would have made a crime victim a "party" to a criminal case, or that would have given crime victims an extensive independent right to litigate whenever they believed that their rights had been abridged or that inadequate consideration had been given to their interests. Instead, the legislature gave crime victims the limited right to seek appellate review of certain felony sentences (sentences below the presumptive range).

We acknowledge that, under AS 12.55.101(a), a judge must consider the goal of protecting the victim(s) when the judge sentences a defendant to probation for a crime of domestic violence. Indeed, this duty to consider the future safety of victims is not confined to domestic violence cases. Under AS 12.55.005, the sentencing judge in any criminal case must consider "the need to confine the defendant to prevent further harm to the public", "the effect of the sentence ... as [an expression of] community condemnation of the criminal act and as a reaffirmation of societal norms", and "restoration of the victim and the community".[34]

Thus, under Alaska law, a sentencing judge must always consider the victim's in-

---

30. 24th Legislature, House Bill 55, § 3.

31. *Id.*

32. *Id.*

33. SLA 2005, ch. 65, § 4.

34. AS 12.55.005(3), (6), and (7).

terests and the interests of the community—protection of the community, reaffirmation of community values, and restoration of the victim and the community—when choosing the defendant's sentence. But this does not mean that all members of the community have the right to challenge the judge's sentencing decision if they believe that the judge's decision fails to adequately protect the public, or fails to adequately express condemnation of the defendant's crime, or fails to adequately restore the community. Even though Alaska law requires sentencing judges to consider both the interests of the community at large and the interests of the people who have particularly suffered as a result of the defendant's conduct, a criminal prosecution is not a private lawsuit brought by the victim(s) against the defendant, nor is a sentencing hearing a community meeting in which all members of the public have a right to enter the discussion and, if dissatisfied, challenge the decision.

As we explained in the first section of this opinion, our system of criminal justice is no longer based on the idea that individual victims should bring perpetrators to court in order to obtain retribution and restitution for the harm done to their personal interests. Rather, criminal conduct is seen as an injury to the community. Criminal prosecutions are undertaken in the name of the community, and the executive branch of government (as the representative of the community) has the sole responsibility and authority to initiate and litigate criminal cases—and, if necessary, to challenge a trial court's decisions by seeking appellate review.

When the legislature enacted our state's Victims' Rights Act (AS 12.61), and when the legislature and the voters later enacted the victims' rights provision of our state constitution (Article I, Section 24), they undoubtedly wanted to enhance the participation of crime victims in the criminal justice process, and to make sure that judicial officers and prosecuting attorneys paid attention to the interests of crime victims. But the question before us now is whether the legislature and the voters wanted to change the basic rule that criminal litigation is initiated and directed by public prosecutors who act in the name of the community, rather than by crime victims who act in their own interest.

It is true, as we acknowledged earlier, that prosecuting attorneys may sometimes make decisions that run contrary to the interests or the wishes of crime victims. Likewise, there will be times when a crime victim disagrees with the sentencing judge concerning how much jail time a defendant should serve, or how big a fine the defendant should pay, or what obligations the defendant should have to fulfill when the defendant is released on probation.

One might argue—in fact, Cynthia does argue—that, in these instances, there is a possibility that the prosecutor or the sentencing judge will be wrong, and the crime victim will be right. But most often there will be no "right" answer and no "wrong" answer. Instead, it will be a question of judgement or a question of degree.

Who is to say whether a defendant should be charged with manslaughter (that is, reckless homicide) or, instead, the lesser offense of negligent homicide? Who is to say whether the government should take the defendant to trial or, instead, negotiate a plea bargain with the defendant? If the case goes to trial and the defendant is convicted, who is to say whether the defendant should receive a sentence of five years' imprisonment or only three?

For two hundred years, the people of this country have believed that the fairest way to resolve these questions is to put the responsibility in the hands of public officials—prosecutors and judges—who have no personal interest in the case. Indeed, some courts have held that the constitutional guarantee of due process of law includes the requirement that all decisions in a criminal prosecution be made by a prosecutor who has no personal stake in the outcome.[35]

---

**35.** See *Adkins v. Commonwealth*, 26 Va.App. 14, 492 S.E.2d 833 (1997), where the court held that the defendant's right to due process was violated when a private attorney retained by the victim's family was appointed as a special prosecutor to handle the defendant's case, after the regular prosecuting attorney withdrew. The court stated:

There will be times when a crime victim is dissatisfied with the way a case is handled or resolved. But we, as a society, have decided that it is fairer to let public officials make these decisions, rather than putting the victim in charge of making these decisions, or letting the victim second-guess or veto these decisions.

In the main, this a matter of principle. But it is also a matter of practicality. The case presently before this Court is not entirely representative of the problem, because here there is only one primary victim. There can easily be more than one victim in a criminal case. Assault and theft cases with three or more victims are not unusual. Indeed, in cases of securities fraud or consumer fraud, there can be dozens or even hundreds of victims. If each of these victims had a separate right to ask for appellate review of the decisions of the prosecuting attorney and the sentencing judge, the system would be unworkable, and our goal of uniform justice would recede farther from sight.

Conceivably, the people of this state (or their elected representatives) might decide to change this fundamental aspect of the criminal justice system. But the question in the present case is whether the voters and the legislature have already done so. Did the voters and the legislature, by enacting the victims' rights section of our state constitution and the statutes that comprise our Victims' Rights Act, intend to alter our system of justice so that crime victims are treated as independent parties in criminal prosecutions (as they were two hundred years ago), with the right to go to court to challenge the substantive decisions of prosecutors and trial judges? We conclude that the answer is "no".

### (e) Conclusion

For all of the reasons we have discussed here, we conclude that a crime victim does not have an independent right to appeal or petition an appellate court to review the sentence imposed on the perpetrator of the crime (except, perhaps, for the limited right of petition now granted by AS 12.55.120(f)).

As we noted earlier, some courts have recognized a crime victim's right to pursue litigation seeking relief in the nature of mandamus (*i.e.*, an appellate court order directing a lower court to follow the law) when a lower court fails to honor the procedural rights given to crime victims by state constitution or by state statute. This issue is not raised in the present case; neither Cynthia Cooper nor her attorney from the Office of Victims' Rights claims that Judge Motyka failed to allow them to attend and be heard at the sentencing hearing.

Accordingly, we leave for another day the question of whether a crime victim in Alaska has the right to seek appellate relief when a lower court fails to honor a crime victim's procedural rights specified in Article I, Section 24 of the Alaska Constitution or in the Alaska Statutes.

*The authority of the Office of Victims' Rights to independently pursue this litigation*

■ As explained above, the Office of Victims' Rights is representing Cynthia Cooper in this litigation. However, the Office claims that they have a greater role in this litigation than simply providing legal representation to Cynthia at public expense. The Office asserts that even if Cynthia has no standing to challenge the sentence imposed by the district court, the Office of Victims' Rights has independent authority to challenge this sentence.

The Office of Victims' Rights points out that the Alaska Legislature has given the Office "jurisdiction to advocate on behalf of [the] victims of felony offenses or class A misdemeanors ... involving domestic violence or a crime against a person under AS

---

[When] a special prosecutor has a personal interest in the outcome of the prosecution, his objectivity and impartiality are called into question, and a defendant's right to a fair and impartial trial is violated. A special prosecutor who was formerly employed by the victim's family in connection with the same proceeding is incapable of exercising the fair-minded prosecutorial discretion to which the defendant is entitled....

*Adkins*, 492 S.E.2d at 835. *Accord, State v. Eldridge*, 951 S.W.2d 775, 782–83 (Tenn.Crim.App. 1997).

11.41." [36] Further, the legislature has directed the Office of Victims' Rights to "assist crime victims in obtaining the rights [that] crime victims are guaranteed under the constitution and the laws of [Alaska] with regard to the contacts crime victims have with justice agencies." [37] Based on its statutory role as an advocate for crime victims, the Office of Victims' Rights argues that it has the independent authority to file lawsuits that advance the interests of crime victims, even when the crime victims themselves would have no right to sue.

But the fact that the Office of Victims' Rights is authorized to serve as an advocate for crime victims does not mean that the Office has an independent right to file lawsuits that the victims themselves could not file.

Attorneys—and this includes attorneys who are salaried officers of a public agency—are the legal representatives of the clients they serve. An attorney is empowered to appear in court for the client, and to make certain decisions on the client's behalf, but the attorney's authority to file a lawsuit is merely an extension of the client's authority to do so. The lawsuit can go forward only if the client has standing to pursue the litigation. That is, when an attorney has no personal legal rights at stake and is acting solely as the legal representative of a client, the attorney has no independent right to file a lawsuit when the client has no personal right to file the lawsuit.

The following cases all hold that a government attorney who is statutorily authorized or obliged to serve as the legal representative of a government agency has no independent authority to pursue litigation if the client agency does not wish to pursue that litigation:

See Soliman v. Ebasco Services Inc., 822 F.2d 320, 323 (2nd Cir.1987); Santa Rita Mining Co. v. Department of Property Valuation, 111 Ariz. 368, 530 P.2d 360, 363 (1975); Chun v. Board of Trustees of the Employees' Retirement System of the State of Hawaii, 87 Hawai'i 152, 952 P.2d 1215, 1225, 1230

(1998); Motor Club of Iowa v. Iowa Department of Transportation, 251 N.W.2d 510, 513, 515–16 (Iowa 1977); State v. Hagan, 44 N.D. 306, 175 N.W. 372, 374 (1919); Matter of Taylor B., 201 W.Va. 60, 491 S.E.2d 607, 613 (1997).

Moreover, the claim made by the Office of Victims' Rights—that the Office has independent authority to file a lawsuit whenever the Office determines that the lawsuit would advance the interests of crime victims—is inconsistent with the statutes that describe the Office's powers.

As explained above, AS 24.65.100(a) gives the Office of Victims' Rights the authority to advocate on behalf of crime victims, and AS 24.65.110(a) gives the Office the authority to assist crime victims in securing their legal rights. But even in situations where the Office of Victims' Rights believes that the rights of a crime victim have been violated, the legislature has not authorized the Office to file a lawsuit. Instead, as we are about to explain, the legislature has given the Office of Victims' Rights the authority to publicly criticize a government agency if the Office believes that the agency has violated a crime victim's rights.

Under AS 24.65.120–130, the Office of Victims' Rights is given the power to investigate potential violations of crime victims' rights. If the Office preliminarily concludes that a government agency or official has violated the rights of a crime victim, the Office must consult with that agency or official. AS 24.65.140. If that consultation fails to resolve the problem, and the Office still believes that a crime victim's rights have been violated, the Office "shall [formally] report [its] opinion and recommendations to [the] agency [involved]". AS 24.65.150(a). And, after waiting a reasonable amount of time following its report to the agency in question, and with the approval of the complaining citizen, the Office "may present [its] opinion and recommendations to the governor, the legislature, a grand jury, the public, or any of these". AS 24.65.160.

---

**36.** AS 24.65.100(a).

**37.** AS 24.65.110(a).

These are essentially the same powers that are given to an analogous arm of the government: the Office of the Ombudsman.

Under AS 24.55.160–220, the Ombudsman is empowered to investigate and ultimately report on the workings of state government, if the Ombudsman concludes that an agency of the government has treated a citizen unfairly or unreasonably. Like the Office of Victims' Rights, the Office of the Ombudsman is authorized to investigate complaints against government agencies. If the Ombudsman preliminarily concludes that a government agency has treated a citizen unfairly or unreasonably, the Office must consult with the agency involved. AS 24.55.180. If that consultation fails to resolve the problem, and the Ombudsman still believes that the agency has mistreated the citizen, the Ombudsman "shall [formally] report [its] opinion and recommendations ... to [the] agency [involved]". AS 24.55.190. And, after waiting a reasonable amount of time following its report to the agency in question, the Ombudsman "may present the opinion and recommendations to the governor, the legislature, a grand jury, the public[,] or any of these". AS 24.65.200.

In other words, it appears that the legislature intended the Office of Victims' Rights to act as a special ombudsman in the area of victims' rights. This undercuts the Office of Victims' Rights' assertion that the Office has an independent power to intervene in a criminal prosecution and appeal the final judgement—because the Ombudsman has no such power.

As we have explained above, neither the statutes outlining the powers of the Ombudsman nor the statutes outlining the powers of the Office of Victims' Rights have any provision for filing lawsuits against an offending state agency or official. Instead, the legislature has granted the Ombudsman and the Office of Victims' Rights the powers to investigate, to advise and mediate, and, when necessary, to publicize the failings of government agencies—by informing the public of their findings, and/or by communicating those findings to an arm of the government that is empowered to take legal action.

This is the approach taken in the American Bar Association's "Model Ombudsman Act for State Governments" first issued in 1974 and later revised in 1997. Under the terms of the Model Act, an ombudsman is authorized to investigate, to consult and to mediate, and to criticize. However, the ombudsman has no power to coerce government agencies to take action, nor the power to sue government agencies in court—except to the limited extent of suing government agencies to force them to comply with Ombudsman subpoenas, or to enjoin their willful obstruction of the Ombudsman's other investigative efforts, or to force them to honor the obligation of confidentiality that normally attaches to the Ombudsman's preliminary report. (*See*, for example, AS 24.55.190(c).)

With respect to the Office of Victims' Rights' assertion that they have the authority to challenge the substance of the district court's sentencing decision in this case, we particularly note the following Comment to Section 3(a)(1) of the Model Ombudsman Act for State Governments (1997)—a model act that was drafted by the United States Ombudsman Association, based primarily on the ABA's Model Act: [38]

[The Model Act precludes ombudsman investigations of judicial acts because of] the existence of the long-established system of appellate review of judicial decisions.... [T]he Ombudsman would have jurisdiction to investigate administrative or ministerial acts by employees of the judicial branch, when those acts are peripheral to the adjudication itself[, as well as jurisdiction to] make recommendations for improving administrative procedures that would have a prospective effect. [However, the] Ombudsman would not, of course, have the jurisdiction to question, criticize or review the substantive content of any judicial order, decision or opinion.

---

**38.** The complete text of this Model Act is available through the web site of the American Bar Association's section on Administrative Law and Regulatory Practice:

http://www.abanet.org/adminlaw/ombuds/usoamodel1.html

This same limitation on an ombudsman's authority is also reflected in the ABA's "Standards for the Establishment and Operation of Ombuds Offices" issued in 2004. Under the ABA Standards, an ombudsman should have no authority to "make, change, or set aside a law, policy, or administrative decision" (Standard D(1)), or to "directly compel [any] entity or any person to implement the [ombudsman's] recommendations" (Standard D(3)). Moreover, under Standard D(5), an ombudsman should have no authority to "accept jurisdiction over an issue that is currently pending in a legal forum unless all parties and the presiding [judicial] officer in that action explicitly consent".

Alaska's ombudsman statutes—in particular, AS 24.55.100–200—do not depart from the substance of sections 11 through 15 of the ABA's Model Ombudsman Act. Based on the wording of our statutes, and based on the commentary to the ABA's 1974 Model Ombudsman Act and its successors, we conclude that the Alaska Legislature intended to codify the policy embodied in the model ombudsman acts—the policy that the ombudsman does not "have the jurisdiction to question, criticize[,] or review the substantive content of any judicial order, decision[,] or opinion".

As we pointed out earlier, when the Alaska Legislature created the Office of Victims' Rights, the legislature defined the powers of that Office using provisions that parallel the statutes defining the powers of the state ombudsman. We therefore conclude that the legislature intended this same policy to apply to the Office of Victims' Rights. That is, the legislature did not intend for the Office of Victims' Rights to have the authority to initiate litigation to question, criticize, or otherwise seek review of the substantive content of any judicial order, decision, or opinion.

For these reasons, we reject the assertion of the Office of Victims' Rights that the Office has independent authority to appeal or otherwise challenge a sentencing decision in circumstances where the Office's client (*i.e.,* the crime victim whom they are representing) has no personal standing to pursue the litigation.

*Part II*

*Did the district court abuse its discretion when the court denied Cynthia Cooper's post-hearing request to seal the statements made by Daniel Cooper's defense attorney concerning the mental health and behavioral problems suffered by Cynthia's son?*

As we explained at the beginning of this opinion, the second part of Cynthia Cooper's original application for relief raises the question of whether Cynthia is entitled to have a portion of the sentencing hearing sealed from public access.

The sentencing hearing in this case was open to the public, and the hearing was apparently attended by spectators and representatives of the media.

During the defense attorney's sentencing argument on behalf of Daniel Cooper, she referred to the fact that Cynthia's son (who lived with the couple) was suffering from mental health and behavioral problems. The defense attorney argued that the boy's problems were a major source of stress in Cynthia's and Daniel's relationship, and that this stress was a primary factor in causing Daniel to engage in this instance of assaultive conduct.

Neither Cynthia nor her attorney from the Office of Victims' Rights objected to the defense attorney's statements about the boy's problems. However, on the Monday following the sentencing hearing, the Office of Victims' Rights (acting on Cynthia's behalf) filed a motion asking the district court to seal the defense attorney's statements on this subject. Cynthia contended that the defense attorney's statements contained "confidential and privileged information" about her son.

Ultimately, the district court declined to seal the defense attorney's statements. The district court's ruling led to this second part of Cynthia's original application for relief.

*A more detailed history of this litigation, and a description of the various legal arguments that Cynthia has asserted in favor of sealing the defense attorney's statements*

Cynthia's original motion to seal portions of the sentencing record asserted that the defense attorney's statements violated her

son's right of privacy and her son's right (as the family member of a crime victim) to be treated with fairness, dignity, and respect. However, in later pleadings, the Office of Victims' Rights emphasized that the legal basis of Cynthia's request was the assertion that the defense attorney's statements revealed confidential information that was protected by the son's psychotherapist-patient privilege.

In its "Reply to [the opposition to the] Motion to Temporarily Seal Court Records" (dated April 2, 2004), the Office of Victims' Rights acknowledged that any admissible information presented at the sentencing hearing—even "derogatory and misleading comments"—should properly remain part of the public record. But the Office of Victims' Rights argued that the defense attorney's challenged statements did not contain admissible information. Rather, the Office of Victims' Rights asserted, the defense attorney's statements contained "inadmissible, privileged information"—and, thus, those statements should be struck from the public record. The problem, the Office of Victims' Rights told the court, was that the defense attorney's statements violated the psychotherapist-patient privilege.

The Municipality of Anchorage opposed Cynthia's motion. One of the Municipality's arguments was that the Office of Victims' Rights had no legal authority to file motions on Cynthia's behalf on this kind of issue— since the issue did not involve any infringement of the rights contained in the Victims' Rights Act, but rather involved an assertion of evidentiary privilege by Cynthia on behalf of her son.

As we explained in the preceding section of this opinion, there is an arguable legal basis for the Municipality's position. However, we need not resolve this legal issue—because, as we explain here, Cynthia's claim of privilege lacks merit.

On May 4, 2004, the district court denied Cynthia's motion to seal the defense attorney's statements. The court noted that the defense attorney's statements were relevant to the issues to be decided at the sentencing hearing, and the court further noted that neither Cynthia nor her attorney from the Office of Victims' Rights objected (at the time) to the defense attorney's statements.

Two weeks later, the Office of Victims' Rights filed a motion asking the district court to reconsider its decision. In its motion for reconsideration, the Office of Victims' Rights conceded that the defense attorney's statements might have been relevant to the issues at the sentencing hearing, but the Office reiterated its argument that those statements were nevertheless inadmissible. In addition, the Office of Victims' Rights raised a new argument: the contention that, before the defense attorney could make the challenged statements, Daniel Cooper was obliged to take the stand and personally testify to the assertions of fact contained in his defense attorney's statements.

The district court did not issue a decision on this motion for reconsideration. Instead, the court allowed the motion to become denied by operation of law (after the passage of 30 days). *See* Criminal Rule 42(k)(4).

*Why Cynthia is entitled to pursue only the one argument based on the psychotherapist-patient privilege*

■ As just explained, Cynthia filed several pleadings in the district court, and those pleadings mentioned various theories as to why the district court should have sealed the defense attorney's statements. Cynthia's original pleading mentioned notions of privacy and victims' rights. However, the Office of Victims' Rights (acting on Cynthia's behalf) ultimately told the district court that the issue was one of evidentiary privilege. Cynthia asserted that the defense attorney's statements should be struck from the public record because those statements contained confidential information that was protected by the psychotherapist-patient privilege codified in Alaska Evidence Rule 504.

■ After the district court denied Cynthia's motion to seal the defense attorney's statements, Cynthia filed a motion for reconsideration in which she raised yet another potential legal basis for sealing the challenged statements. But as our supreme court stated in *Blackburn v. Department of Transportation and Public Facilities,* 103 P.3d 900, 906 (Alaska 2004), a court "[is]

under no obligation to consider an issue raised for the first time in a motion for reconsideration"—and if the trial court decides not to address the newly raised issue, that issue can not be pursued on appeal.

For these reasons, we conclude that the sole argument that Cynthia has preserved for appeal is the argument that the defense attorney's statements violated the psychotherapist-patient privilege. All of Cynthia's other arguments are waived.

*Why we reject Cynthia's argument that the defense attorney's statements should be struck from the public record of the sentencing hearing*

■ We have two reasons for rejecting Cynthia's contention that the challenged statements should be struck from the public record. First, with one possible exception, none of the challenged statements appear to be covered by the psychotherapist-patient privilege. Second, Cynthia waived whatever psychotherapist-patient privilege she might otherwise have claimed when she and her attorney from the Office of Victims' Rights failed to contemporaneously object to the challenged statements.

*(a) With one possible exception, Cynthia had no valid claim of privilege with respect to the defense attorney's statements*

Alaska Evidence Rule 504(b) contains the following definition of the psychotherapist-patient privilege:

**General Rule of Privilege.** A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of the patient's physical, mental[,] or emotional conditions ... between or among the patient, the patient's physician or psychotherapist, or persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.

As can be seen from the text of this rule, the privilege applies only to "confidential communications" among the group of people named in Evidence Rule 504(b). The term "confidential communication" is defined in Evidence Rule 504(a)(4):

A communication is confidential if [it is] not intended to be disclosed to third persons other than those present to further the interest of the patient in the consultation, examination, or interview, or [to] persons reasonably necessary for the transmission of the communication, or [to] persons who are participating in the diagnosis and treatment under the direction of the physician or psychotherapist, including members of the patient's family.

During her sentencing argument on behalf of Daniel Cooper, the defense attorney referred several times to the mental health and behavioral problems suffered by Cynthia's son. But the psychotherapist-patient privilege does not cover all testimony that discloses that someone suffers from mental health or behavioral problems, or that describes those problems, or that describes other people's reactions to those problems. The privilege has a narrower scope: it applies only to testimony that reveals the substance of confidential communications made for the purpose of diagnosing or treating those problems.

Cynthia objects to statements made by the defense attorney which asserted or revealed: (1) that Cynthia's son had undergone counseling for something that had happened to him; (2) that the boy was troubled; (3) that he was not responding well to the counseling; (4) that he engaged in abusive behavior while in counseling; (5) that he had been sent to live in a residential facility for several months; (6) that Cynthia and Daniel were experiencing stress because of their uncertainty as to how to deal with the boy's problems; (7) that, a few days before Daniel's act of domestic violence, both Cynthia and Daniel had to leave work because school officials contacted them and informed them that Cynthia's son was engaging in inappropriate behavior; (8) that Cynthia believed that her son had engaged in other inappropriate behavior at home; (9) that, one day later, Daniel told Cynthia that he thought that her son

needed to return to residential treatment;[39] (10) that two nights before the domestic assault, Cynthia and Daniel were having dinner with another couple, and the man of this couple ordered Cynthia's son to leave the table because the boy was being obnoxious; (11) that Cynthia believed that the man had acted inappropriately, so she followed her son up to his room to talk to him; (12) that, following this conversation with her son, Cynthia came back downstairs and announced (in front of everyone) that she was going to end her relationship with Daniel—that she was leaving, and that she was taking her son with her, to protect her son from Daniel's plan to send the boy back to a residential facility; (13) that Daniel and Cynthia had a house rule that Cynthia's son was not to have his bedroom door closed; and (14) that on the night of the domestic assault, Cynthia apparently assisted her son in locking his door.

None of the defense attorney's statements appear to reveal the substance of "confidential communications" as that term is defined in Evidence Rule 504(a)(4). Indeed, many of the defense attorney's statements do not reveal the substance of any communication at all.

The defense attorney did allude to one communication that is arguably covered by the psychotherapist-patient privilege: a statement attributed to a mental health professional who was treating Cynthia's son, in which the mental health professional expressed an assessment of the boy's case. This particular statement may not have been admissible over a claim of privilege. But as we explain in the next section of this opinion, no objection was made.

*(b) Cynthia forfeited her claim of privilege by failing to object to the defense attorney's statements*

Under the law of evidence, there are many types of evidence which should be excluded if someone objects, but which remain admissible if no one objects. For instance, the law excludes many types of hearsay evidence, but this hearsay evidence is admissible—and is properly considered by the court—if no one objects.[40]

There is a similar rule for evidence that is covered by one of the privileges codified in the 500 section of the Alaska Evidence Rules. Under Evidence Rule 510, the holder of an evidentiary privilege waives their privilege if they "voluntarily ... consent[ ] to disclosure of any significant part of the matter or [the] communication".

Evidence Rule 510 speaks of "waiver", which normally entails an affirmative action—a voluntary relinquishment of a known right.[41] However, the Commentary to Evidence Rule 510 explains that Rule 510 is really talking about forfeiture—the loss of the privilege through failure to act. This rule of forfeiture applies even when the privilege-holder was unaware, at the time, that they could have claimed a privilege and prevented the disclosure of the information:

> In [these] situations, once [the] confidentiality [of the information] is destroyed through voluntary disclosure, no subsequent claim of privilege can restore it, and [the privilege-holder's] knowledge or lack of knowledge of the existence of the privilege appears to be irrelevant. 8 *Wigmore [on Evidence* ] § 2327.

Commentary to Alaska Evidence Rule 510, third paragraph.

Moreover, in this context, the law deems a person to have "consented" to the disclosure of privileged information if the person, being present and able to object to the disclosure, fails to object. For instance, in John W. Strong *et al., McCormick on Evidence* (5th ed.1999), the authors explain

---

39. This statement was conceivably made for the purposes of furthering the boy's treatment, but it does not appear to be confidential. From the defense attorney's narrative, it seems that Daniel made this statement in front of another couple who were having dinner at Cynthia's and Daniel's home.

40. *Hayes v. State*, 581 P.2d 221, 222 n. 2 (Alaska 1978); *Vaska v. State*, 74 P.3d 225, 230 (Alaska App.2003); *Cassell v. State*, 645 P.2d 219, 220–21 (Alaska App.1982).

41. *See*, for instance, *Vroman v. Soldotna*, 111 P.3d 343, 347 n. 9 (Alaska 2005); *Hillman v. Nationwide Mutual Fire Ins. Co.*, 758 P.2d 1248, 1253 (Alaska 1988).

that this rule of forfeiture—*i.e.*, loss of the privilege through inaction—governs the attorney-client privilege:

> [I]t is clear that the client may assert the privilege even though he is not a party to the cause [in which] the privileged testimony is sought to be elicited. [But] if he is present at the hearing[,] whether as [a] party, witness, or bystander[,] he must assert the privilege personally or by [his] attorney, or it will be waived.

*McCormick*, § 92, Vol. 1, pp. 369–370.

See also *McCormick's* discussion of the same rule applied to the marital privilege, *id.*, § 83, Vol. 1, p. 336: "A failure by the holder to assert the privilege by objection ... is a waiver."

Also see *Williams v. Utility Equipment, Inc.*, 837 P.2d 1112, 1116–17 (Alaska 1992), where the Alaska Supreme Court held that, despite the existence of a protective order excluding the challenged testimony, "[the appellant] waived his objections ... when he did not make specific objections [at the time] the testimony was presented".

In *Clifton v. State*, 758 P.2d 1279 (Alaska App.1988), this Court applied the same rule to the psychotherapist-patient privilege. We declared that this privilege is not self-executing: "The plain language of [Evidence Rule 504] appears to require that someone act to exercise the privilege." *Id.* at 1284. Accordingly, we found no plain error in a case where neither the defendant nor his attorney objected (until appeal) to the contested disclosures. *Id.*

In the present case, Cynthia and her attorney did not object to the defense attorney's statements until after the sentencing hearing was over, and after the sentencing judge had already relied on the challenged statements. In her brief to this Court, Cynthia asserts that she was "surprised and caught off guard" by the defense attorney's statements. There is nothing in the record to support this assertion. In fact, the record appears to belie this assertion—because the statements that Cynthia challenges in this appeal were uttered over the course of several minutes. The defense attorney repeatedly referred to

these matters during her sentencing argument to the court; the challenged statements are scattered throughout ten pages of the sentencing transcript.

Moreover, under the rule of forfeiture that we have described above, it does not matter if Cynthia was surprised by the fact that the defense attorney would mention these matters. When the holder of an evidentiary privilege is present and able to object to the disclosure of information covered by the privilege, but the privilege-holder fails to object, the privilege is lost and the disputed evidence is admissible.

Arguably, the present case raises a slightly different issue: whether a privilege-holder who has waived the privilege by failing to object may later retroactively assert the privilege and ask the court to erase or seal the record of the earlier challenged testimony.

According to *Wigmore on Evidence*,[42] the rule at common law is that once an evidentiary privilege is waived, the privilege can not be reasserted by the privilege-holder at a later stage of the same proceeding, or at any subsequent judicial proceeding:

> A waiver at a former trial should bar a claim of the [physician-patient] privilege at a later trial, for the original disclosure takes away once and for all the confidentiality sought to be protected by the privilege. To enforce it thereafter is to seek to preserve a privacy which exists in legal fiction only.

*Wigmore*, § 2389(4), Vol. 8, pp. 860–61.

*Accord: Cerro Gordo Charity v. Fireman's Fund American Life Ins. Co.*, 819 F.2d 1471, 1478 (8th Cir.1987); *State v. Mincey*, 141 Ariz. 425, 687 P.2d 1180, 1194 (1984); *State v. Clark*, 296 N.W.2d 372, 376 (Minn.1980); *State v. Bishop*, 187 N.J.Super. 187, 453 A.2d 1365, 1368 (App.Div.1982); *People v. Bloom*, 193 N.Y. 1, 85 N.E. 824, 825–26 (1908); *General American Life Ins. Co. v. Ettinger*, 266 A.D. 876, 42 N.Y.S.2d 836, 837 (1943); *In re Postley*, 125 Misc.2d 416, 479 N.Y.S.2d 464, 465 (1984).

For these reasons, we conclude that Cynthia's failure to raise a contemporaneous ob-

---

**42.** J. Wigmore, *Evidence in Trials at Common Law* (Chadbourn rev.1978).

jection to the defense attorney's statements means that Cynthia forfeited her right to claim that the defense attorney's statements violated her son's psychotherapist-patient privilege.

### (c) Conclusion

As we have explained here, none of the defense attorney's statements (with one possible exception) revealed confidential communications covered by the psychotherapist-patient privilege. Moreover, neither Cynthia Cooper nor her attorney from the Office of Victims' Rights objected to the defense attorney's statements until after the sentencing hearing was over. For these reasons, the psychotherapist-patient privilege provided no basis for Cynthia Cooper to ask the district court to seal the defense attorney's statements from the public.

### Overall Conclusion

This case has required us to resolve weighty issues that have not been decided before in Alaska. Our opinion is quite lengthy, and not only because the issues were new.

The question of victims' rights inspires strong feelings, and the main question posed in this appeal—whether a crime victim has a right to independently challenge the substantive decisions of the trial judge—has required us to examine some of the most fundamental principles of our criminal justice system. We have been aided in this task by a number of *amicus curiae* briefs, and we appreciate the care and effort that went into the researching and writing of those briefs.

For the reasons explained here, we conclude that neither Cynthia Cooper nor the Office of Victims' Rights has the right to challenge the district court's sentencing decision. The right to challenge the sentencing decision rests solely with the parties to this criminal prosecution—the plaintiff, Municipality of Anchorage, and the defendant, Daniel Cooper. Accordingly, this portion of the original application for relief is DISMISSED.

We further conclude that the district court correctly denied Cynthia Cooper's request to seal portions of the sentencing hearing from the public—because (with one possible excep-

tion) the challenged statements made by the defense attorney do not contain information protected by the psychotherapist-patient privilege, and also because Cynthia waived whatever privilege she would otherwise have had when she failed to contemporaneously object to the defense attorney's statements. Accordingly, with regard to this portion of the original application for relief, the decision of the district court is AFFIRMED.

STEWART, Judge, not participating.